# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAVID MONTOYA and
MICHAEL MONTOYA,

      Plaintiffs,

vs.                                                                           No. CIV 10-0360 JB/WDS

GERALD SHELDON, an Officer Employed
by the Albuquerque Police Department, a Subsidiary
of the City of Albuquerque, Individually and in his Official Capacity,
ANGELO LOVATO, an Officer Employed
by the Albuquerque Police Department, a Subsidiary
of the City of Albuquerque, Individually and in his Official Capacity,
THE CITY OF ALBUQUERQUE and
THE ALBUQUERQUE POLICE DEPARTMENT,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion to Supplement Discovery,

filed June 7, 2012 (Doc. 42)("Motion to Supplement"). The Court held a hearing on July 12, 2012.

The primary issues are: (i) whether Plaintiffs David Montoya and Michael Montoya have shown

good cause to modify discovery deadlines, agreed to in the Joint Status Report and Provisional

Discovery Plan, filed August 31, 2010 (Doc. 14)("Scheduling Order"), more than a year after the

completion of discovery, because they wish to add D. Montoya's treating physician -- Dr. Barbara

Bath -- whom he first saw before the Montoyas filed the case, as an expert witness, and Dr. Baldwin,

the physician who signed the note excusing M. Montoya from wearing a seatbelt; (ii) whether Dr.

Baldwin can testify to signing the note that M. Montoya provided to Defendant Officer Gerald

Shelden[1] when the Montoyas failed to disclose Dr. Baldwin as a witness; and (iii) whether Dr. Bath, not disclosed as an expert witness under rule 26(a)(2) of the Federal Rules of Civil Procedure, can testify as a lay witness to D. Montoya's mental condition, which the Montoyas allege the Defendants' unconstitutional conduct caused. The Court will grant in part and deny in part the Montoyas' Motion to Supplement. Because the Montoyas have not shown that disclosing Dr. Bath as an expert witness by the November 10, 2010, disclosure deadline could not be met despite their due diligence, they have not shown good cause, which is required to modify the Scheduling Order. The Court will thus deny their request to do so. The Court will, however, allow Dr. Baldwin to testify that he wrote and signed the note that M. Montoya gave to Shelden. The Court will also allow Dr. Bath to testify to the facts of her treatment of D. Montoya, and permissible lay witness opinions, but will not allow her to testify to her opinions which are based on scientific, technical, or specialized knowledge.

## FACTUAL BACKGROUND

On April 16, 2007, M. Montoya was driving a vehicle, with D. Montoya sitting in the passenger seat, southbound on 8th Street near the intersection with Bridge Street in Albuquerque, New Mexico, when Shelden informed the Montoyas that they needed to pull over. See Plaintiffs' Complaint for Civil Rights Violations ¶¶ 11-13, at 3 (Doc. 1)("Complaint"). When Shelden informed M. Montoya that he pulled him over because M. Montoya was not wearing a seatbelt, M.

---

[1]The Defendant Gerald Shelden's name is spelled inconsistently throughout the documents that both parties submitted, in some cases spelling the last vowel in Shelden's name with an 'o,' and in some cases with an 'e.' The court reporter, Paul Baca, who recorded Shelden's deposition on March 11, 2011, spells his name with an e. Because it is standard practice for a court reporter to ask the spelling of the deponent, and because of the Court's respect for the careful work of Mr. Baca, the Honorable Judith C. Herrera, United States District Judge's court reporter, the Court will adopt that spelling of Shelden's name for the entirety of this Memorandum Opinion and Order.

Montoya produced a note from his physician, Dr. Baldwin, excusing M. Montoya from wearing a seatbelt because of a medical condition.  See Complaint ¶¶ 14-15, at 3-4.  Shelden looked at M. Montoya's note, told him that "it was a 'bogus ass note,'" and asked M. Montoya to follow Shelden back to the back of his police car, where he proceeded to write M. Montoya multiple citations.  See Complaint ¶¶ 17-19, at 4.  When Shelden asked M. Montoya to sign the citations, M. Montoya "asked a question regarding one of the violations to clarify a number on the violation, when Defendant Shelden became enraged, and cursed at Plaintiff Michael Montoya, and began to physically assault him," grabbing M. Montoya by the back of the head and "repeatedly slamm[ing] his head into the truck of [Shelden's] police car."  Complaint ¶¶ 21-22, at 4.  Shelden then placed M. Montoya under arrest.  See id. ¶ 23, at 5.

Upon seeing Shelden arrest M. Montoya, D. Montoya got out of the car to try to reason with Shelden and the other Defendant Officer, Angelo Lovato.  See id. ¶ 24, at 5.  The Defendants yelled at D. Montoya to get back in the car.  See id. ¶ 25, at 5.  D. Montoya got back in the car, and when one of the officers approached the car, D. Montoya locked the car door.  See id. ¶¶ 26-27, at 5.  When the officer pulled out a weapon to break the window, D. Montoya unlocked the car door, "got out of the car and put his hands in the air to cooperate."  Id. ¶¶ 28-29, at 5.  "He was immediately assaulted by the Defendant Officers, placed in handcuffs, and the Defendant Officers utilized mace on him."  Id. ¶ 29, at 5.  D. Montoya was then placed in the police car, with no air holes and the windows rolled up, and when he pleaded for air, he was denied.  See id. ¶ 30, at 5.  M. Montoya, "upon informing Defendant Shelden he suffered from claustrophobia, was forced to place a 'gladiator' type helmet on his head, and sit in the back of the police car, while the Defendant Officer rolled up the windows," turned the heat on high and left M. Montoya there for two hours.  Id. ¶ 31, at 5-6.  M. Montoya was charged with disorderly conduct, head lights required, seatbelt use required,

and no possession of a driver's license; all of these charges were thereafter dismissed.  See id. ¶ 32, at 6.  D. Montoya "was charged with resisting/evading/obstructing a police officer[,] failure to obey police & fire department, and disorderly conduct," all of which were dismissed.  Id. ¶ 33, at 6.

## PROCEDURAL BACKGROUND

On April 15, 2010, the Montoyas  filed their Complaint.  In Counts I through IV, they assert claims for violations of the Fourth Amendment to the United States Constitution against the Defendants, including claims of false imprisonment and arrest, excessive force, and unlawful detention.  See Complaint ¶¶ 37, 41, 44, 47, at 6-8.  In Count V, the Montoyas assert a malicious-prosecution claim.  See Complaint ¶ 48, at 8.

On August 12, 2011, the Montoyas filed a motion seeking to re-open discovery for the limited purpose of allowing Plaintiffs to submit discovery requests to Defendant Angelo Lovato about a criminal charge he faces regarding leaving the scene of an accident.  See Memorandum Opinion and Order at 2, filed March 20, 2012 (Doc. 39)("MOO").  The Court granted the motion in part and denied the motion in part.  See MOO at 1.  The Court did not permit the Montoyas to serve any requests for admission or requests for discovery to inquire into Lovato's conduct in relation to the alleged incident where he left the scene of an accident.  See MOO at 1.  The Court also did not permit the Montoyas to conduct their requested deposition of Lovato, because of the length of discovery, it is collateral to the case here and related only to the issue of Lovato's credibility.  See MOO at 1-2.  The Court conducted an in camera review of the internal-affairs-investigation file into Lovato's conduct to determine whether the Defendants should disclose any of the documents underlying that investigation to the Montoyas.  See MOO at 2.

On August 31, 2010, the parties adopted a Joint Status Report and Provisional Discovery Plan.  See Doc. 14 ("JSR").  In it, the Montoyas identify only themselves as witnesses and state that

they do not expect any experts to testify on their behalf.  Status Report at 7.  The report also says

that, unless the parties otherwise agreed, "reports from retained experts under Rule 26(a)(2) [are]

due: from Plaintiff by November 10, 2010," and discovery was to close by March 10, 2011.  Status

Report at 8.  On September 10, 2010, the Honorable W. Daniel Schneider, United States Magistrate

Judge, issued an order adopting the JSR.  See Order Adopting Joint Status Report and Provisional

Discovery Plan (Doc. 17).  Judge Schneider issued a Scheduling Order on March 30, 2011, that

incorporated the parties' agreed upon date of March 10, 2011 as "the termination for discovery."

Doc. 26.  It also states that the "Plaintiff shall identify to all parties in writing any expert witness to

be used by Plaintiff at trial and to provide expert reports pursuant to Fed.R.Civ.P. 26(a)(2)(B) no

later than November 10, 2010."  Scheduling Order at 2.

     On September 20, 2010, the Defendants filed the Amended Certificate of Service, in which

they certify that they mailed the first set of interrogatories and requests for production.  See Doc.

20.  In the interrogatories, the Defendants ask the Montoyas to list the experts they plan to call, and

the Montoyas do not list Dr. Baldwin or Dr. Barbara Bath.  See Defendants' First Set of

Interrogatories to Plaintiff David Montoya at 1-5, filed June 11, 2012 (Doc. 45-1); Defendants' First

Set of Interrogatories to Plaintiff Michael Montoya at 1-4, filed June 11, 2012 (Doc. 45-2).  In

Request for Production No. 11, the Defendants ask the Montoyas to produce copies of expert witness

reports and their related documents, and the Montoyas respond that the have "none at this time, will

provide when they are obtained."  Defendants' First Request for Production to Plaintiff David

Montoya  at 5, filed  June 11, 2012 (Doc. 45-3); Defendants' First Request for Production to

Plaintiff Michael Montoya at 5, filed June 11, 2012 (Doc. 45-4).  On March 10, 2011, the Montoyas

submitted a witness list that does not contain Dr. Baldwin or Dr. Bath.  See Plaintiffs' Witness List

at 1-3, filed June 11, 2012 (Doc. 45-5).  The Montoyas also do not name either doctor in the Pretrial

Order.  See Pretrial Order at 9-10, filed June 11, 2012 (Doc. 45-6).

On June 7, 2012, the Montoyas filed this Motion to Supplement Discovery.  See Doc. 42. The Motion to Supplement requests that, under rule 26(b)(1): "The Court allow the Plaintiffs to supplement discovery responses for the Plaintiffs – (1) an expert to testify about the post-traumatic stress condition which Plaintiff David Montoya suffers, and (2) the physician or physician's assistant who wrote the note regarding the seat belt exception for plaintiff Michael Montoya."  Motion to Supplement at 1.  The Montoyas argue that, even though the deadline in the discovery order has passed, the Court should permit them to add the new experts, because "it has become clear that no settlement in this case is likely," which changes what the Montoyas anticipate they will need to prove their case.  See Motion to Supplement at 1-2.  The Montoyas state that, now that they have an expert to testify concerning D. Montoya's condition, they must disclose the identity of the expert and the expert's written report pursuant to rule 26(a)(2)(B), or provide  a summary of the subject matter of the report pursuant to rule 26 (a)(2)(C).[2]  See Motion to Supplement at 2.  The Montoyas

_____

[2]Rule 26(a)(2) provides for when a party must disclose to the other parties their expert witnesses:

**(2) Disclosure of Expert Testimony**.

**(A)** In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

**(B)** Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report -- prepared and signed by the witness -- if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

**(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;

argue that, "since there has been no setting for trial, the Defendants are not prejudiced by the untimely disclosure of Plaintiff's expert witness."  See Motion to Supplement at 2.  The Montoyas also state that, if the Court allows Dr. Baldwin, who wrote the seatbelt exception note for M. Montoya, to testify, it would not prejudice the Defendants, because the Dr. Baldwin's identity was available from his identification in the note that the Montoyas entered into evidence.  See Motion to Supplement at 2.

On June 11, 2012, the Defendants filed the Defendants' Response to Plaintiffs' Motion to Supplement Discovery.  See Doc. 45 ("Response").  The Defendants state: "Plaintiffs do not allege in their complaint that they suffered damages from 'Post Traumatic Stress Disorder' or damages from emotional distress."  Response at 2.  The Defendants argue that the Montoyas do not provide "any explanation as to why they could not provide the information as requested."  Response at 3.

───────────────

      **(ii)** the facts or data considered by the witness in forming them;

      **(iii)** any exhibits that will be used to summarize or support them;

      **(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;

      **(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

      **(vi)** a statement of the compensation to be paid for the study and testimony in the case.

**(C)** Witnesses Who Do Not Provide a Written Report. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

      **(i)** the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

      **(ii)** a summary of the facts and opinions to which the witness is expected to testify.

The Defendants state that the Montoyas failed to identify Dr. Baldwin and Dr. Bath, in violation of rule 26(a)(2).  <u>See</u> Response at 3.  The Defendants argue that the Montoyas never disclosed either Dr. Bath or Dr. Baldwin, or provided expert materials before the deadline which the Court set for experts or for discovery generally, and never sought the Court's leave to extend the expert deadline to comply with their expert disclosure obligations.  <u>See</u> Response at 3.

The Defendants argue that allowing Dr. Baldwin and Dr. Bath to testify would violate both rule 26(a)(2)(A) rule and 26(a)(2)(D), because the Montoyas acted inconsistently with the requirements of the discovery process generally and with the schedule the Court ordered.  <u>See</u> Response at 4.  They argue that a scheduling order may be modified only for good cause and with the judge's consent, but failure to settle is not good cause.  <u>See</u> Response at 4.  They also state that the Montoyas offered no reason why they could not have provided the doctors' names before the deadline.  <u>See</u> Response at 4.  Additionally, the Defendants argue that the Montoyas failed to provide the medical records that would be necessary to corroborate the Montoya's mental health assertions.  <u>See</u> Response at 5.  The Defendants state that, if the Court were to grant the Montoya's Motion to Supplement, the Court would "also be bound to reopen discovery to allow  Defendants time to review and decipher the expert material, obtain their own experts if necessary, depose Plaintiffs' experts, and possibly depose and/or submit additional interrogatory or requests for production."  Response at 6.  The Defendants contend that they would suffer prejudice by being "forced to spend additional costs and resources as well as further delay of these proceedings all because of Plaintiffs' failure to comply with fundamental rules of procedure without justification."  Response at 6.

The Court held a hearing on July 12, 2012.  At the hearing, the Montoyas asserted that the subject of the Motion to Supplement was the status of two doctors; Dr. Baldwin, who examined M.

Montoya and gave him a note excusing him from wearing a seatbelt; and Dr. Bath, who interviewed D. Montoya and can testify to psychological and physical damages.  <u>See</u> Federal Digital Tape Recorder at 9:09:24-09:47 (July 12, 2012)(Gallegos)("FTR").  The Montoyas then asserted that rule 26 allows for the reopening of discovery even in cases where there was not strict adherence to the discovery order, if the moving party can show good cause.  <u>See</u> FTR at 9:09:54-10:08 (Gallegos). The Montoyas stated that the doctors were not on the witness lists, because the sides were unsure whether the case would settle, but because the attempts to settle failed, the Montoyas now need their testimony.  <u>See</u> FTR at 9:10:08-10:37 (Gallegos).  The Montoyas stated that Dr. Baldwin's testimony is important to lend credibility to the note he wrote for M. Montoya, the genuineness of which is a substantive issue they argued.  <u>See</u> FTR at 9:10:37-11:13 (Gallegos).  In response to the Court questioning whether the note had yet been produced, the Montoyas stated that it had been produced early in the dispute, and that the note has Dr. Baldwin's signature, name, and contact information.  <u>See</u> FTR at 9:11:14-11:32 (Court, Gallegos).  The Montoyas argued that the Montoyas' failure to name Dr. Bath earlier did not prejudice the Defendants, because all parties were aware of Dr. Bath's role in the case and had her contact information.  <u>See</u> FTR at 9:11:38-11:53 (Gallegos).  The Court asked how the seatbelt exception would be relevant in the case, and the Montoyas answered that M. Montoya gave the arresting officer a note from a doctor excusing him from the legal requirement to wear a seatbelt, which note Shelden concluded was fraudulent. <u>See</u> FTR at 9:12:07-12:38 (Court, Gallegos).

The Court asked the Montoyas where they failed to list the doctors as witnesses, and the Montoyas answered that there were interrogatories that asked for the witnesses the parties anticipated calling.  <u>See</u> FTR at 9:13:26- 14:09 (Court, Gallegos).  The Montoyas asserted that they named the doctors in one of the documents that they submitted during discovery, but not in the

document that requested the list of witnesses.  See FTR at 9:14:06-14:27 (Court, Gallegos).  The

Court asked if the Honorable John E. Conway, United States District Court Judge,[3] or the Honorable

W. Daniel Schneider, United States Magistrate Judge, had required the Montoyas to give an

exhaustive list of witnesses, and the Montoyas answered that they had not.  See FTR at 9:15:34-

15:51 (Court, Gallegos).  Instead, the Montoyas stated that the Defendants' Interrogatory No. 19

asked for a list of the experts and that they had not submitted Dr. Baldwin's name on that list.  See

FTR at 9:16:00-17:08 (Gallegos).  The Court asked when the Montoyas became aware that they

would need the new experts' testimony, and the Montoyas answered that it came to their attention

after reviewing the testimony of the other parties following the settlement conference.  See FTR at

9:17:45-9:18:47 (Court, Gallegos).

    The Montoyas turned to Dr. Bath, and asserted that Dr. Bath had not provided an experts'

report, but had worked with D. Montoya after the incident and observed his panic attacks.  See FTR

at 9:19:05-20:04 (Gallegos).  The Montoyas stated that they do not have dates for D. Montoya's

treatment with Dr. Bath, and that D. Montoya saw her once before the suit was filed and once after

the suit was filed.  See FTR at 9:21:23-21:43 (Gallegos).  The Court asked if the second visit was

before the discovery deadline, and the Montoyas did not know.  See FTR at 9:21:46-22:04 (Court,

Gallegos).  The Montoyas asserted that Dr. Bath's testimony would give information relevant to

damages.  See FTR at 9:22:14-23:10 (Gallegos).  The Montoyas anticipated that Dr. Bath's

testimony would show that D. Montoya had panic attacks.  See FTR at 9:23:11-23:58 (Gallegos).

The Court asked if the Montoyas' medical records had been produced, and the Montoyas answered

---

[3]This case was originally assigned to Judge Conway, but was reassigned to the Honorable
James O. Browning, United States District Court Judge on July 13, 2011.  See Minute Order (Doc
31).

that they had been produced to the Defendants early in the litigation.  See FTR at 9:23:58-24:15 (Court, Gallegos).  The Court asked the Montoyas if the Defendants knew that D. Montoya had been seeing Dr. Bath, and the Montoyas answered that they believed the records from at least one visit to Dr. Bath had been produced, but they were not entirely sure.  See FTR at 9:24:24-25:11 (Court, Gallegos).

The Defendants stated that the Montoyas' Motion to Supplement did not identify the witnesses by name.  See FTR at 9:25:24-25:26 (Griffin).  The Defendant argued that the rules in place are designed to prevent situations such as this one, to avoid trial by ambush in a situation where discovery has long closed and a party attempts to introduce new witnesses.  See FTR at 9:26:26-27:00 (Griffin).  The Defendants contended that the Montoyas had not given any reason for the delayed release of the names, and the Court should not find good cause to allow the doctors to testify.  See FTR at 9:27:17-27:29 (Griffin).

The Court then suggested that Dr. Baldwin be limited to testifying that the he had written the note.  See FTR at 9:27:46-28:18 (Court).  The Defendants agreed, even though they stated that they did not contest the authenticity or the content of the note.  See FTR at 28:21-28:27 (Griffin).  Instead, the Defendants argued that the question in the case is whether Shelden's belief that the note was inauthentic was reasonable, and that Dr. Baldwin's testimony would not be relevant to that issue.  See FTR at 9:28:27-28:45 (Griffin).  The Court asked both parties if they would agree to a stipulation that the note was authentic, and they both agreed.  See FTR at 9:32:42-33:07 (Court, Griffin, Gallegos).  The Court then proposed that the parties work out a stipulation that Dr. Baldwin's testimony would be limited only to the authenticity of the note, and the Court would make an equivalent order if the parties could not agree to a stipulation, only allowing Dr. Baldwin to testify that it is a valid note the he signed or produced.  See FTR at 9:34:06-9:35:23 (Court).

-11-

The Court asked Defendants whether they had seen the document the to which the Montoyas referred, and they responded that they received a few of D. Montoya's medical records, but could not remember if they were directly from Dr. Bath or how many times they indicated D. Montoya had seen Dr. Bath.  See FTR at 9:36:02-36:42 (Court, Griffin).  They stated that they did not object to the Montoyas calling the treating physicians as fact witnesses, but objected to their wanting to call them as expert witnesses, which they argued is beyond the scope of the disclosures that the rules require.  See FTR at 9:36:43-37:14 (Griffin).  The Defendants also stated that none of the records indicated a formal diagnosis of Post Traumatic Stress Disorder.  See FTR at 9:37:25-37:39 (Griffin).  The Court then asked the Defendants if they were aware that D. Montoya saw a doctor regarding a mental issue, and they indicated that they were, but they were concerned that the records that the Montoyas produced under the medical release did not include subsequent treatments.  See FTR at 9:37:41-38:32 (Court, Griffin).  The Defendants stated that it was their recollection that the record contained evidence of only a few visits.  See FTR at 9:38:44-38:48 (Griffin).

The Court stated that an expert witness can testify about future repercussions of an individual's status, but a treating physician who is not identified as an expert could relate only what the physician had discovered during treatments and could not testify about the future.  See FTR at 9:38:55-39:28 (Court).  The Court proposed allowing the doctors to testify to the factual events they witnessed, which all parties found acceptable.  See FTR at 9:39:29-41:37 (Court, Griffin, Gallegos).  The Montoyas then added that they would have no problem submitting another medical release to cover treatment that occurred after the previous medical release.  See FTR at 9:41:33-41:43 (Gallegos).

### LAW REGARDING MODIFICATION OF SCHEDULING ORDERS

"The District Court has wide discretion in its regulation of pretrial matters."  Si-Flo, Inc. v.

SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990).  Scheduling orders, however, "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Accord Street v. Curry Bd. of Cnty. Comm'rs, No. CIV 06-0776 JB/KBM, 2008 WL 2397671, at *6 (D.N.M. Jan. 30, 2008)(Browning, J.).  The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension.  Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a "manifest injustice" or "substantial hardship" test.  Otherwise, a fear that extensions will not be granted may encourage counsel to request the longest possible periods for completing pleading, joinder, and discovery.

Fed.R.Civ.P. 16(b)(4) advisory committee's note to 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and diligence are related.   "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Street v. Curry Bd. of Cnty. Comm'rs, 2008 WL 2397671, at *6.  See  Advanced Optics Electronics, Inc. v. Robins, 769 F.Supp.2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order.").   "The Tenth Circuit . . . has recognized the interrelation between 'excusable neglect' and 'good cause.'"  Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D.Kan. 1996)(citing In re Kirkland, 86 F.3d 172, 175 (10th Cir. 1996)).  In In re Kirkland, the Tenth Circuit dealt with the definition of "good cause" in the context of rule 4(j), and noted:

> [W]ithout attempting a rigid or all-encompassing definition of good cause, it would appear to require at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified' is normally required.

86 F.3d at 175 (emphasis in original)(quoting Putnam v. Morris, 833 F.2d 903, 905 (10th Cir.

-13-

1987))(internal quotation marks omitted).  The Tenth Circuit explained that <u>Putnam v. Morris</u> "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'"  <u>In re Kirkland</u>, 86 F.3d at 175.

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request.  In <u>Advanced Optics Electronics, Inc. v. Robins</u>, the Court found that, where the defendant did not conduct discovery or make any good faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling order.  769 F.Supp.2d at 1313 n. 8.  In <u>Street v. Curry Bd. Of Cnty. Comm'rs</u>, however, the Court found that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery."  2008 WL 2397671, at *11.

## RELEVANT LAW REGARDING TREATING PHYSICIAN TESTIMONY

Parties in Federal Court must disclose all witnesses, including expert witnesses, in a timely manner.  Thus, plaintiffs must disclose treating physicians, whether they are to testify as lay witnesses or experts, in accordance with the rules.  Lawyers have to be careful about planning on using their treating physicians to slip into trial expert testimony without providing an expert report, because the 2000 amendments to the Federal Rules of Evidence has changed significantly the opinion of testifying experts.

1.      **Law Regarding the Requirement to Disclose Treating Physicians Under Rule 26(a)(2).**

Rule 26(B) requires parties to disclose in a timely manner, in addition to fact witnesses identified in rule 26(a)(1), any expert witnesses.  <u>See</u> Fed.R.Civ.P. 26(a)(2)(A).  In most cases, the parties must also disclose a written expert report.  <u>See</u> Fed.R.Civ.P.(a)(2)(B).[4]  The advisory committee notes to the 1993 amendment to rule 26(a)(2) states that the rule allows a treating physician who is disclosed as an expert to give expert testimony without submitting a written report:

> [T]his rule . . . continue[s] to use the term "expert" to refer to those persons who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters.  The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case. . . .  A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.

Fed.R.Civ.P. 26(a)(2)(B) advisory committee's note to 1993 amendment.  When a witness or a

---

[4]Before December1993, rule 26 stated, in pertinent part:

(b) **Discovery Scope and Limits.** Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

. . .

> (4) **Trial Preparation: Experts**. Discovery of facts known and opinions known by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial may be obtained only as follows:
>
> > (A)( *i* ) A party may through interrogatories require any other party to identify each person the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (*ii*) Upon motion, the court may order further discovery by other means . . . .

.
Fed.R.Civ.P. 26 (1992).

treating physician is not disclosed as an expert under 26(a)(2), the witness can "still testify as a fact witness[], but [cannot] testify as [an] expert[]." Musser v. Gentiva Health Servs., 356 F.3d 751, 757 (7th Cir. 2004)(holding that, while the treating physicians were not required to give an expert report, they could not testify as experts where the plaintiff failed to disclose the physicians under rule 26(a)(2), only doing so under rule 26(a)(1)). See Weese v. Schukman, 98 F.3d 542, 550 (10th Cir. 1996)(holding that treating physician, not disclosed under rule 26(a)(2), was allowed to give proper lay witness testimony under rule 701; Davoll v. Webb, 194 F.3d 1116, 1138 (10th Cir. 1999)(holding that treating physician's testimony was proper lay testimony, because the physician "explained various medical terminology and drew a diagram . . . [which] clarified his testimony on his treatment of [the plaintiff] and did not constitute opinion testimony.").

In Sturgeon v. ABF Freight Systems, Inc., the Court granted a motion to strike portions of a plaintiff's affidavit the were beyond the scope of a treating physician, because the plaintiff failed to disclose the physician as an expert witness under rule 26(a)(2) before the expert disclosure deadline. See 2004 WL 5872664, at *3. Because the physician treated the plaintiff from 1994 to 1996, the Court restricted the physician to "his personal care and treatment of [the plaintiff]," during that time period. 2004 WL 5872664, at *3. The Court did not allow the physician to testify as to the plaintiff's current medical status or opine on his status by reliance on other physicians' records, and also did not allow the physician to "offer expert medical and/or legal opinions as to the [plaintiff's] alleged current disability." Sturgeon v. ABF Freight Systems, Inc., 2004 WL 5872664, at *3).

### 2.    Law Regarding Permissible Lay Testimony of Treating Physicians Before the 2000 Amendments to the Federal Rules of Evidence.

Rule 701 of the Federal Rules of Evidence governs a treating physician's lay testimony.

-16-

Under rule 701 before December 2000, lay witness testimony was subject to only two restrictions, providing that lay testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R.Evid. 701 (1997). The United States Court of Appeals for the Tenth Circuit on two occasions ruled on the permissibility of treating physician testimony when testifying as a lay witness under this rule. See Weese v. Schukman, 98 F.3d 542; Davoll v. Webb, 194 F.3d 1116. In Weese v. Schukman, the Tenth Circuit held that the district court did not err in allowing the defendant physician to testify as to his opinions whether his care met the standard of care and about causation as a lay witness:

> Although [the plaintiff] does not challenge [the treating physician]'s testimony under the lay opinion rule, we note that any opinions offered by [the physician] were based on his experience as a physician and were clearly helpful to an understanding of his decision making process in the situation. Moreover, in a pretrial order, the district court specifically ruled that [the physician], as a non-expert, could "testify regarding the standard of care and causation . . . ." . . . Accordingly, the court did not err in admitting [the] testimony.

98 F.3d at 550. In Davoll v. Webb, on the other hand, while the Tenth Circuit uses language that would lead one to believe that a treating physician "should be given 'loose reign to state what are truly facts, even if they are expert facts,'" the holding in the case was much narrower. 194 F.3d at 1138 (quoting 4 B. Weinstein & M. Berger, Weinstein's Federal Evidence § 701.08 (J. McLaughlin ed., 2d ed.1999)). The Tenth Circuit held only that the treating physician did not give improper expert testimony in testifying to his opinion that the patient suffered from psychological stress:

> With respect to the "psychological impairment" testimony . . . [the physician] simply stated that, based on his interactions with [the plaintiff], he understood that [the plaintiff] was suffering from psychological stress because Denver was "pressuring him to retire." . . . [The physician] did not attempt to name a particular psychological disorder or give an in-depth analysis as to [the plaintiff]'s mental health. He simply stated . . . that the retirement proceedings caused [the plaintiff] stress. . . . That conclusion is within the province of a lay witness such as [the physician] who has

-17-

personal knowledge of the situation.

194 F.3d at 1138-39 (emphasis added).  The Tenth Circuit also noted that "[a] treating physician, even when testifying as a lay witness, may state 'expert' facts to the jury in order to explain his testimony."  Davoll v. Webb, 194 F.3d at 1138.  The Tenth Circuit held that, while the treating physician explained "various medical terminology and drew a diagram explaining Mr. Davoll's injury, those actions . . . clarified his testimony on his treatment of [the patient] and did not constitute opinion testimony."  194 F.3d at 1138.

### 3.    Law Regarding Permissible Law Testimony of Treating Physicians After the 2000 Amendments to the Federal Rules of Evidence.

Rule 701 was amended in 2000. The language restricting opinions by lay witnesses only to opinions "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," was added to "ensure[] that a party will not evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26 and Fed.R.Crim.P. 16 by simply calling an expert witness in the guise of a lay person." Fed.R.Evid. 701 advisory committee notes to the 2000 amendments.  See 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 701.03[4][b], at 701-31 (J. McLaughlin ed., 2d ed.2012)(noting that the 2000 amendment to rule 701 "ensures evidence qualifying as expert testimony . . . will not evade the reliability scrutiny mandated by . . . Rule 702 . . . [and] provides assurance that parties will not use Rule 701 to evade the expert witness pretrial requirements of Federal Rule of Civil Procedure 26 and Federal Rule of Criminal Procedure 16.").   A witness not properly identified as an expert pursuant to rule 26 of the Federal Rules of Civil Procedure may thus testify as a lay witness to opinions which are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Fed.R.Evid. 701.  The Advisory Committee on the Federal Rules of Evidence notes that the 2000 amendment to rule 701 was intended to distinguish between testimony rather than witnesses:

> The amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony. Certainly it is possible for the same witness to provide both lay and expert testimony in a single case. . . . The amendment makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules.

Fed.R.Evid. 701 advisory committee notes to the 2000 amendments (emphasis in original).

The 2000 amendments thus restrict the permissibility of treating physicians' lay testimony. Rule 701 no longer permits a treating physician to offer "any opinions . . . based on . . . experience as a physician and . . . clearly helpful to an understanding of [the] decision making process in the situation," Davoll v. Webb, 194 F.3d at 1138 (quoting Weese v. Schukman, 98 F.3d at 550),[5] but requires that those opinions not be based on scientific, technical, or specialized knowledge, see Musser v. Gentiva Health Servs., 356 F.3d at 757 n. 2 ("[A] treating doctor (or similarly situated witness) is providing expert testimony if the testimony consists of opinions based on 'scientific, technical, or other specialized knowledge' regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation."); 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 701.03[4][b], at 701-37 (J. McLaughlin ed., 2d ed.2012)("If the proposed testimony is based on scientific, technical, or other specialized knowledge, it is expert testimony."); 29 C.Wright, V. Gold, & M. Graham, Federal Practice and Procedure § 6253, at 119 & 2012 supp.

---

[5]Generally, a district court must faithfully follow controlling Tenth Circuit precedent, but there is an exception when the statute or rule on which the prior decision was based has changed. See San Juan County, Utah v. United States, 503 F.3d 1163, at 1189-90 (10th Cir. 2007)(recognizing that an amendment to the Federal Rules of Civil Procedure, which changed the law to rule 24, made all pre-amendment decisions no longer binding precedent).

30 (1997 & Supp. 2012)(noting that while there was "nothing in Rule 701 [to] prohibit[] a lay witness from arriving at an opinion through the application of specialized experience . . . [the 2000] amendment to the provision establishes just such a prohibition.").

Under the amended rule 701, "a treating physician who has not been identified as an expert witness pursuant to Rule 26(a)(2) may not provide testimony beyond the scope of her treatment of plaintiff and [the physician's] conclusions must fall within the province of a lay witness." Parker v. Cent. Kansas Med. Ctr., 57 F.App'x. 401, 404 (10th Cir. 2003) (unpublished opinion)(quoting Parker v. Cent. Kansas Med. Ctr., 178 F.Supp.2d 1205, 1210 (D.Kan. 2001))(internal quotations omitted). In Parker v. Cent. Kansas Med. Ctr., the Tenth Circuit held that the United States District Court for the District of Kansas did not err in striking the affidavit testimony of the plaintiff's treating physician, "conclud[ing] that [the physician's] opinion as to the standard of care and causation was expert testimony relating to treatment beyond that which was incidental to her personal care and treatment." 57 F.App'x at 404 (noting that the plaintiff's treating physician "should have been identified as an expert . . . [to allow the physician to] testify to the standard of care and causation."). The Tenth Circuit distinguished Weese v. Shuckman, reasoning that, in Weese v. Schukman, the physician testified based on his own treatment of the patient, while the physician in Parker v. Cent. Kansas Med. Ctr. testified to another physician's treatment of the patient:

> Weese is distinguishable on its facts. There, the defendant doctor testified as to the standard of care and causation regarding his treatment of the plaintiff, "based on his experience . . . [and to aid the jury's] understanding of his decision making process in the situation." By contrast, [the treating physician]'s affidavit related to the standard of care regarding another physician's refusal to treat and to the causation of complications allegedly resulting from delay in treatment. [The treating physician] should have been identified as an expert witness and [the plaintiff] should have disclosed that [the treating physician] would testify as to the standard of care and causation.

-20-

57 F.App'x at 404 (quoting Weese v. Schukman, 98 F.3d at 550)(internal citation and emphasis omitted).

"Rule 701 does not permit a lay witness to express opinion as to matters which are beyond the realm of common experience and which require special skill and knowledge of an expert witness." James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1214 (10th Cir. 2011)(quoting Randolph v. Collectramatic, Inc., 590 F.2d 844, 846 (10th Cir. 1979))(internal quotations omitted).  A treating physician testifying as a lay witness cannot testify to any opinions regarding causation under rule 701, because opinions regarding causation of a medical condition require "knowledge derived from precious professional experience[, which] falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d at 1215 (quoting United States v. Smith, 640 F.3d 358, 365 (D.C.Cir. 2011)).  See Witherspoon v. Navajo Ref. Co., L.P., CIV 03-1160 BB/LAM, 2005 WL 5988650, at *2 (D.N.M. June 28, 2005)(Black, J.)(concluding that physician who treated the plaintiffs in a toxic tort case, not disclosed under rule 26(a)(2), could testify only to "observations and treatment developed while actually treating Plaintiffs," and could not testify to "any causation opinions drawn."); United States v. Henderson,  409 F.3d 1293, 1300 (11th Cir. 2005)(holding that physician's testimony about the cause of the injury was "a hypothesis" and therefore not lay testimony); O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1105 n. 14 (7th Cir.1994)(holding that treating physicians are subject to rule 702, because "we do not distinguish the treating physician from other experts when the treating physician is offering expert testimony regarding causation").

A treating physician's opinions regarding diagnosis of a medical condition is almost always expert testimony, because diagnosis requires judgment based on scientific, technical, or specialized

knowledge in almost every case.  See James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d at 1214

(holding that a calculation involving depreciation is improper lay testimony, because "[t]echnical

judgment is required in choosing among different types of depreciation.").  "Diagnosis has been

defined as 'the use of scientific or clinical methods to establish the cause of a person's illness'. . .

[and, therefore,] seem[s] to fall beyond the scope of permissible lay testimony."  D. Beane & T.

Karatinos, Catching the Chameleon: When is the Treating Physician an Expert?, in 51-May Fed.

Law. 26, 27 (2004)(quoting Taber's Cyclopedic Medical Dictionary 557 (D. Venes & C. Thomas

eds., 19th ed. F. Davis 2001)).  There are cases, however, where a diagnosis may be lay testimony,

because it is within the province of the common person.  See James River Ins. Co. v. Rapid Funding,

LLC, 658 F.3d at 1214 ("Rule 701 allows lay witnesses to offer observations that are common

enough and require a limited amount of expertise, if any.")(quoting United States v. VonWillie, 59

F.3d 922, 929 (9th Cir. 1995))(internal quotations and changes omitted);  United States v.

Henderson, 409 F.3d at1300 (noting that the "diagnosis . . . that [the plaintiff]'s jaw was fractured,

would be permissible lay testimony.").  Diagnosing that a patient suffers from a complicated

medical condition is expert testimony:

> We note that a number of courts have ruled that medical evidence is not required to
> establish causation . . . . However, alcoholism and depression are complicated
> medical conditions. Whereas testimony from lay witnesses may be sufficient to
> establish that an individual is "distressed" in some fashion, it may not be sufficient
> to establish that an individual suffers from a particular medical condition such as
> alcoholism or depression which only professional medical care providers may be
> qualified to diagnose.

Jefferson v. Milvets Sys. Tech., Inc., 172 F.3d 919, at *1 (D.C.Cir. 1999)(unpublished table

opinion)(internal citations omitted).  See Davoll v. Webb, 194 F.3d at 1138-1139 (holding that

physician's testimony that the patient was under psychological stress, because he was being

pressured to retire, was a "conclusion within the province of a lay witness.").  In Ferris v.

Pennsylvania Fed'n Broth. of Maint. Way Emps., 153 F.Supp.2d 736 (E.D.Pa. 2001), where the

plaintiff asked that the treating physician be allowed to testify to diagnosis as a lay witness, the

United States District Court for the Eastern District of Pennsylvania concluded that a treating

psychologist could not "testify regarding any specific medical diagnosis of [the plaintiff's] mental

ailments as the conditions from which he suffers -- depression and anxiety disorder -- are complex

injuries beyond the knowledge of a layperson." 153 F.Supp.2d at 746. See Frazier v. Indiana Dept.

of Labor, 2003 WL 21254424, at *4 (S.D.Ind. Mar. 17, 2003)(unpublished opinion)(concluding that

"[a]ny specific diagnoses of the plaintiff's [medical, psychological or psychiatric conditions] . . .

require expert testimony."); Hahn v. Minnesota Beef Indus., Inc., 2002 WL 32658476, at *3

(D.Minn. May 29, 2002)(unpublished opinion)("Depression and anxiety disorder are complex

injuries, requiring expert (as opposed to lay) testimony regarding diagnosis and causation.").[6]

---

[6]The 2000 amendments to rules 701, 702, and 703 do not squarely address the question whether a treating physician may ever testify as a lay witness, and if so, to what extent. Professors Beane and Karatinos state that, "[a]t least with respect to mere treatment alone, the idea that 'a treating physician is not automatically an expert witness simply because he is a doctor' still exhibits some validity." Beane & Karatinos, Catching the Chameleon: When is the Treating Physician an Expert?, in 51-May Fed. Law. at 27 (quoting Tzoumis v. Tempel Steel Co., 168 F.Supp.2d 871, 876 (N.D. Ill. 2001)). Their position is that a treating physician may testify as a lay witness if the physician's "proposed opinion testimony involves only mundane medical treatment." Catching the Chameleon: When is the Treating Physician an Expert?, in 51-May Fed. Law. at 27. They state that, "[a]lthough the amended Rule 701 draws a bright line," it would be permissible lay testimony "if a treating physician opined that the cut on a person's arm appeared red and puffy and then some ointment was applied." Beane & Karatinos, Catching the Chameleon: When is the Treating Physician an Expert?, in 51-May Fed. Law. at 27. While such a bright-line rule would be easy to apply, rule 701 was not drafted so simply and has not been applied so narrowly. Moreover, even Beane and Karatinos concede that life is rarely so simple and clear, and in a world where peoples' occupations and roles are becoming increasingly specialized, requiring specialized knowledge, there is no desire or need to make everyone an expert witness. Thus, although there is logic in the assumption that almost all of a physician's treatment of her patients relies on scientific technical, or other specialized knowledge, requiring it to be admitted under rule 702, the Tenth Circuit does not seem to draw such a bright line. Although the Tenth Circuit has not defined the bounds of permissible testimony for a treating physician as a lay witness, it seems that it is permissible for a treating physician to provide testimony about the treatment of the physician's patients. See Parker

-23-

The Federal Rules of Evidence require a high degree of reliability for expert testimony, because it may be based on inadmissible evidence.  See Fed.R.Evid. 703.  Before allowing expert testimony, the Court must ensure that the testimony meets the standards the Supreme Court of the United States set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 -- often done by a hearing on whether the expert and the expert report, disclosed pursuant to rule 26(a)(2), meet this standard.  Allowing a treating physician to testify in the same capacity and to the same extent as an expert, without requiring even disclosure of the physician's identity, would undermine both the Daubert v. Merrell Dow Pharms., Inc. analysis and rule 702 requirements.  Any plaintiff could get around the disclosure requirements of rule 26(a)(2) and Daubert v. Merrell Dow Pharms., Inc.'s reliability standards by simply asking a physician for treatment, even once, instead of hiring a physician as an expert for the trial.  The Honorable Bruce Black, United States District Judge for the District of New Mexico, discussed why the 2000 amendments to the Federal Rules of Evidence, dealing with expert testimony, suggest care must be taken to restrict the testimony of treating physicians not disclosed as experts under rule 26(a)(2):

> [L]ay witnesses may only offer opinions based on their own perceptions and may not offer opinions based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701. This latter restriction was added by a 2000 amendment in order to prevent parties from smuggling in expert testimony under Rule 701 (lay witnesses), thus, evading the reliability analysis of Daubert and the disclosure requirements of Rule 26(a)(2). 4 Jack B. Weinstein and Margaret A. Berger, Weinstein's Federal Evidence § 701.03[4] [b] (J. M. McLaughlin ed., Matthew Bender 2d ed.2005). As a result, this amendment compels courts to categorize more testimony from treating

---

v. Central Kansas Med. Ctr., 57 F.App'x at 404 (holding that district court did not abuse its discretion in finding that "a treating physician who has not been identified as an expert witness pursuant to Rule 26(a)(2) 'may not provide testimony beyond the scope of her treatment of plaintiff,' and that [the physician]'s conclusions 'must fall within the province of a lay witness.'")(quoting Parker v. Cental Kansas Med. Ctr., 178 F.Supp.2d at 1210).  A court must be vigilant, however, not to let a treating physician's discussion of treatment become a discussion of her opinions based on specialized knowledge.

physicians as subject to expert disclosure requirements and some courts have barred
testimony from physicians about their diagnosis and treatment, finding that such
opinions are necessarily based on expert knowledge. Dorothea Beane & Theodore
E. Karatinos, Catching the Chameleon: When is the Treating Physician an Expert?,
in 51-May Fed. Law. 26, 27 (2004). Under Tenth Circuit law, treating physicians not
disclosed as experts are limited to testimony based on personal knowledge and may
not testify beyond their treatment of a patient.

Witherspoon v. Navajo Ref. Co., L.P., 2005 WL 5988650, at *2.

## ANALYSIS

The Court will grant in part and deny in part the Montoyas' Motion to Supplement.  The

Court does not find that the Montoyas have shown good cause to modify the Scheduling Order,

because they have not shown that, despite their diligence, they could not have complied with the

deadlines.  To the extent that the Montoyas request to supplement their discovery by adding Dr.

Baldwin and Dr. Bath to the witness list, the Court will grant that request, because there was

evidence in the record sufficient to put the Defendants on notice that the doctors may testify.

Because the Montoyas failed, however, to disclose any experts they intended to have testify at trial

by the November 10, 2010, rule 26(a)(2) deadline to disclose experts, Dr. Baldwin and Dr. Bath may

testify only as lay witnesses, and may not testify to any information that is based on scientific,

technical, or other specialized knowledge.

## I.      THE COURT DOES NOT FIND GOOD CAUSE TO MODIFY THE SCHEDULING ORDER AND TO REOPEN DISCOVERY.

The Montoyas seek to supplement their discovery responses to add the physician -- Dr. Bath

-- treating D. Montoya for a mental condition resulting from the Defendants' alleged

unconstitutional conduct.   The Montoyas' explanation for their failure to identify Dr. Bath in any

interrogatories or requests for production before the date of the close of discovery is that, "since

[the] time [discovery had closed], Plaintiff David Montoya has continued counseling concerning his

anxiety and fears following the incident." Motion to Supplement at 2. The Defendants assert that the Montoyas "never disclosed any expert or provided expert materials as required by Fed.R.Civ.P. 26(a)(2) by November 10, 2010 as agreed to by the parties and as ordered by the Court." Response ¶ 13, at 3. Nor did the Montoyas "disclose[] any expert or provide[] expert materials . . . on or before the close of discovery on March 10, 2011." Response ¶ 14, at 3. They contend that the Montoyas have not shown good cause, the showing that the Federal Rules of Civil Procedure require to modify the Scheduling Order, because they have provided no explanation why they could not disclose D. Montoya's physician by November 10, 2010, nor why disclosing Dr. Bath took them over one a half years after that deadline. See Response at 4-5.

That D. Montoya "has continued counseling" since the close of discovery on March 10, 2011, suggests that he was seeking counseling before the discovery deadline. The Montoyas' explanation for bringing forward Dr. Bath this late in the case is that, "[p]reviously, Plaintiff did not have an expert to testify concerning his condition," but now the Montoyas have identified an expert. Motion to Supplement 2. This explanation, however, is undercut by the fact that Dr. Bath is the physician that has been treating D. Montoya for his mental issues all along -- having seen him once before the case was filed and at least one time afterward. See FTR at 9:21:23-21:43 (Gallegos). The Montoyas also stated that they did not bring forward Dr. Bath as an expert witness originally, because it appeared that the case would settle; now that it does not appear settlement is probable, they need the expert to testify. See FTR at 9:10:08-10:37 (Gallegos). Although the Court has broad discretion in pre-trial matters, see Si-Flo, Inc. v. SFHC, Inc., 917 F.2d at 1514, to modify the scheduling order and reopen discovery requires a showing of "good cause." Fed. R. Civ. P. 16(b)(4). The "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order." Advanced Optics Electronics, Inc. v. Robins, 769 F.Supp.2d 1285, 1313 (D.N.M.

2010)(Browning, J.).  The Montoyas filed this case on April 15, 2010.  Because D. Montoya had

seen the physician before that date, the fact that the Montoyas are only now bringing the physician

forward as a newly identified expert witness, over two years later, and over one and a half years after

the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can

find excusable neglect nor good cause.  See In re Kirkland, 86 F.3d at 175 ("'[G]ood cause,' . . .

would . . . require at least as much as would be required to show excusable neglect, as to which

simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice. . . .").

Believing that a case will settle, no matter how much it appears that the belief will come true, is not

a reasonable basis for noncompliance with the time specified for completion of discovery.  See In

re Kirkland, 86 F.3d at 175 ("[S]ome reasonable basis for noncompliance within the time specified'

is normally required [for a showing of good cause].").  It is always reasonable, rather, to assume

there is a chance, if not more, that settlement may not occur.  If the parties do not want to complete

discovery while they are trying to settle a case, they should jointly move to push discovery deadlines

back.  Unilaterally ceasing to complete discovery is not a prudent response to approaching discovery

deadlines.

The Montoyas also assert in their Motion to Supplement that the Court should allow them

to supplement their discovery by adding Dr. Bath, because the "Defendants are not prejudiced by

the untimely disclosure of Plaintiff's expert witness," reasoning that the Court had not yet set the

case for trial when they filed the Motion to Supplement.  Motion to Supplement at 2.  Rule 16(b),

however, "does not focus on . . . prejudice to the opposing party."  Advanced Optics Electronics,

Inc. v. Robins, 769 F.Supp.2d at 1313 (quoting Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co., 986

F.Supp. 959, 980 (D.S.C. 1997)).  That the untimely disclosure of Dr. Bath has prejudiced the

Defendants is not essential to finding that the Montoyas have shown good cause for not complying

-27-

with the Scheduling Order.  On the other hand, the Defendants contend that they are prejudiced, because the Montoyas' late disclosure of Dr. Bath as an expert witness is a tactic harkening back to "the former process of 'trial by ambush,'" a problem that the Federal Rules of Civil Procedure were amended to eliminate.  Beller ex rel. Beller v. U.S., 221 F.R.D. 689, 693 (D.N.M. 2003)(Garcia, J.)("The revised rules eliminate the former process of 'trial by ambush,' and mandate full disclosure of relevant information necessary to evaluate the case or to prepare for trial at an early stage of the proceedings.").  In this case, the Montoyas not only failed to designate Dr. Bath as an expert witness under rule 26(a)(2), but they failed disclose her as a witness at all under 26(a). See Watson v. United States, 485 F.3d at 1107 (holding that district court erred by letting treating physician, disclosed as a witness under rule 26(a)(2) but who did not provide a written report, give expert testimony).  Because the Montoyas failed to disclose Dr. Bath as a witness at all under rule 26, the Montoyas contend that, if the Court allows Dr. Bath to give expert testimony, the Defendants would be prejudiced unless the Court allowed the Defendants time to review Dr. Bath's medical records, obtain their own experts if necessary, depose Dr. Bath, and possibly depose and/or submit additional interrogatory or requests for production.  See MTD Response at 6.  The Montoyas' failure to list Dr. Bath, however, is not a case of "trial by ambush."  The Defendants conceded that they obtained D. Montoya's medical records early in the litigation and that those records evidenced visits with Dr. Bath.  See Tr. at 9:36:28-36:57 (Griffin).  This case is thus not one in which the opposing party has blind sided the other party with a witness of whom the party had no prior notice.

The Montoyas cannot, however,  maintain that the Scheduling Order's November 10, 2010, deadline to disclose expert witnesses could not be "reasonably be met despite the diligence of the party seeking the extension." Fed.R.Civ.P. 16(b)(4) advisory committee's note to 1983 amendment. The language in the Montoyas' Motion to Supplement suggests that D. Montoya knew that his

anxiety and fear resulted from the Defendants' alleged unconstitutional conduct.  See Motion to Supplement at 2 (stating that D. Montoya "has continued counseling concerning his anxiety and fears following the incident.").  If D. Montoya did not know for certain that the Defendants' conduct caused his mental issues, it would take a mental health professional, using scientific or specialized knowledge, to establish whether the incident was the cause.  It was thus foreseeable from the first time that D. Montoya saw Dr. Bath -- before the Montoyas filed the case, but after the incident had occurred -- that expert testimony would be required.  The Court, therefore, cannot reasonably say that the Montoyas, in not disclosing an expert witness to testify to D. Montoyas mental health issues by the November 10, 2010, deadline for expert witness disclosure, or the March 10, 2011, deadline for the close of discovery, acted with diligence.  The Court thus does not find good cause to modify the Scheduling Order.  See Street v. Curry Bd. of Cnty. Comm'rs, 2008 WL 2397671, at *6 ("Properly construed, good cause means that scheduling deadlines cannot be met despite a party's diligent efforts.").  The Court will deny the Montoyas' request to modify the Scheduling Order to allow late disclosure of Dr. Bath as an expert witness.

## II.  THE COURT WILL ALLOW DR. BALDWIN TO AUTHENTICATE THE NOTE.

The Montoyas request that the Court allow them to supplement their discovery responses and submit two new witnesses.  Motion to Supplement at 1.  The Montoyas first wish to proffer testimony from Dr. Baldwin, the "physician . . . who wrote the note regarding the seat belt exemption for Plaintiff Michael Montoya."  Motion to Supplement at 1. See FTR at 9:09:24-09:47(Gallegos).  Although the Defendants are willing to stipulate to the authenticity of the note excusing M. Montoya from wearing a seatbelt, the Montoyas also ask the Court to allow Dr. Baldwin to get on the stand, and to tell the jury that the note is authentic and that he signed the note, to lend credibility to M. Montoya's note. The Defendants oppose Dr. Baldwin testifying at all,

because he was not disclosed as a witness under rule 26(a)(1) and they contend that the authenticity of the note is not at issue in this case; they are even willing to stipulate to its authenticity.  What is at issue, they contend, is the reasonableness of Shelden's belief that it was not real.  The Montoyas assert, however, that, because Shelden will be on the stand to testify to his belief that the note was fraudulent, to give their side of the case equal weight with the jury, the Court should allow Dr. Baldwin to testify in front of the jury also.  Dr. Baldwin's testimony that he wrote and/or signed the note regarding the seatbelt exemption -- to rebut any possible inference of fabrication -- describes his treatment of M. Montoya, because it describes what he directed for the medical care of M. Montoya's injury.  See New Oxford American Dictionary 1844 (A. Stevenson & C. Lindberg eds., 3d ed. 2010)(defining treatment as "medical care given to a patient for an illness or injury.").  Moreover, that Dr. Baldwin wrote and/or signed the note is admissible, because under this limited purpose of admissibility, the act of signing the note does not constitute opinion testimony.  See Davoll v. Webb, 194 F.3d at 1138 (holding that the treating physician's act of drawing a diagram and his explanations of medical terms was proper lay testimony because it "did not constitute opinion testimony.").  The Court will therefore allow Dr. Baldwin to testify that he wrote and/or signed the note.  While the Defendants' willingness to stipulate to the authenticity of the note comes close to making Dr. Baldwin's testimony irrelevant, the Montoyas are not required to accept the stipulation and, with the burden of persuasion, are able to offer their own means of presenting evidence in order to tell to give "evidentiary depth" to their story of the case.  United States v. Ashley, No. CR 04-2497, 2006 WL 4109679, at *2 (D.N.M. Aug. 1, 2006)(Browning, J.)("[T]he prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story.")(quoting Old Chief v. United States, 519 U.S. 172, 190 (1997)).  Because the Montoyas did not disclose Dr. Baldwin as a witness under rule 26(a)(1) or rule 26(a)(2) by the Scheduling Order's

-30-

deadline, or anytime prior to the Motion to Supplement, the Court will restrict Dr. Baldwin's testimony to allow him only to authenticate the note.  The Defendants have known about the note and who wrote it for quire some time; for that limited issue, there is no surprise or prejudice.  Dr. Baldwin Dr. Baldwin may thus testify that the note is valid, and that he wrote and/or signed the note. The Court will not, however, permit Dr. Baldwin to testify to M. Montoya's circumstances which required Dr. Baldwin to provide him with the note.  The Montoyas have never listed him as a witness, either lay or expert, for any purpose beyond writing the note.  Testimony beyond the note -- such as M. Montoya's circumstances that necessitate the note -- would not be relevant to any issue in the case.

### III.   THE COURT WILL ALLOW DR. BATH TO GIVE LAY TESTIMONY REGARDING HER TREATMENTS OF D. MONTOYA WHICH ARE NOT BASED ON HER SCIENTIFIC, TECHNICAL, OR SPECIALIZED KNOWLEDGE AS A PHYSICIAN.

The Montoyas wish to supplement their discovery by proffering the current physician treating D. Montoya for his mental issues -- Dr. Bath -- as an expert witness. Because Dr. Bath interacted with D. Montoya in his treatment, she is a lay witness and may testify to her treatment of D. Montoya, as long as the testimony is "rationally based" on her perceptions at the time of the treatment and helpful to determining a fact in issue. Fed.R.Evid. 701.  As an educated and certified physician, however, Dr. Bath uses scientific, technical, and other specialized knowledge in forming her opinions, even unintentionally and unconsciously.   Consistent with its gate-keeping responsibilities, it is the Court's role to ensure that, because Dr. Bath was not timely disclosed as an expert witness, her lay testimony opinions are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701.  See Musser v. Gentiva Health Servs., 356 F.3d at 757 (holding that the physicians disclosed under rule 26(a)(1), but not

timely disclosed under rule 26(a)(2), "could still testify as fact witnesses, but they could not testify as experts).

The Montoyas assert that Dr. Bath worked with D. Montoya after the incident and observed his panic attacks. <u>See</u> FTR at 9:19:05-20:04 (Gallegos). They wish to offer her testimony to show that D. Montoya had panic attacks and also to give to the jury information relevant to damages. <u>See</u> FTR at 9:22:14-23:10 (Gallegos). The Court asked the Montoyas if the Defendants knew that D. Montoya had been seeing Dr. Bath, and the Montoyas answered that they believed the records from at least one visit to Dr. Bath had been produced. <u>See</u> FTR at 9:24:24-25:11 (Court, Gallegos). The Defendants maintain that none of the medical records they received from the Montoyas indicated a formal diagnosis of D. Montoya for Post Traumatic Stress Disorder (PTSD). After the 2000 amendments to rule 701, and under <u>Parker v. Cent. Kansas Med. Ctr.</u>, a treating physician may provide testimony only "within the province of a lay witness," to the treatment of the patient, 57 F.App'x at 404, meaning that the testimony must be "lay testimony." Fed.R.Evid. 701 advisory committee notes to the 2000 amendments. Professor Steven Saltzburg illustrates the application of rule 701 to a treating physician:

> When the physician testifies that the plaintiff was coughing and running a fever, this is lay witness testimony governed by Rule 701. However, if the physician also testifies that he diagnosed the patient as having Reactive Airways Dysfunction Syndrome caused by exposure to a toxic chemical, then this is testimony based on scientific, technical, or other specialized knowledge and must be qualified under Rule 702.

4 S. Saltzburg, M. Martin, D. Capra, <u>Federal Rules of Evidence Manual</u> § 701.02[7], at 701–17 (9th ed. 2006). Dr. Bath, therefore, can testify to any of D. Montoya's panic attacks that she perceived, and D. Montoya's descriptions of the panic attacks he suffered. Dr. Bath can also refer to them as "panic attacks," because that "conclusion is [likely] within the province of a lay witness . . . who has

personal knowledge of the situation."  Davoll v. Webb, 194 F.3d at 1139.  She can go as far as to

testify that D. Montoya told her that he began having these attacks only after the Defendants' alleged

unconstitutional conduct, because it is helpful in clarifying her treatment of D. Montoya, and D.

Montoya's statements to her are not based on her scientific, technical, or specialized knowledge.[7]

    Because Dr. Bath is testifying as a lay witness only, however, she cannot "express opinion

as to matters which are beyond the realm of common experience and which require special skill and

knowledge of an expert witness."  James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d at 1214

(quoting Randolph v. Collectramatic, Inc., 590 F.2d at 846)).  Although some courts allow a treating

physician testifying as a lay witness to testify to diagnosis, because of the "complex nature of

depression and other mental conditions," Dr. Bath cannot testify to any diagnosis of PTSD or any

other mental disorder.  Ferris v. Pennsylvania Fed'n Broth. of Maint. Way Emps., 153 F.Supp.2d

at 745 (finding that treating physician testifying as a lay witness could not testify to the physician's

diagnosis of the patient's alleged mental conditions, because, given the complex nature of mental

conditions, "any proffered testimony on these subjects must meet the requirement of Rule 702 and

the Daubert line of cases.").  Nor can she offer opinion testimony that it was the Defendants' alleged

unconstitutional conduct which caused D. Montoya's panic attacks, because such testimony must

be qualified as expert testimony under rule 702.  See James River Ins. Co. v. Rapid Funding, LLC,

658 F.3d at 1215 ("Knowledge derived from precious professional experience falls squarely within

---

        [7]The statements would not be admissible under rule 803(4) of the Federal Rules of Evidence
if Dr. Bath were not a doctor with scientific, technical, anf specialized knowledge, because they
were made to her "for . . . medical diagnosis or treatment . . . ."  Fed.R.Evd. 803(4).  Even though
she is not permitted to use that expert knowledge in her testimony, she is simply relaying the
statements D. Montoya said to her for treatment and offering no opinion at all.  Because D. Montoya
made the statements to her for treatment, and because the statements "are reasonably pertinent to
. . . the treatment,"  Fed.R.Evid. 803(4), the statements fall under rule 803(4) and are therefore
admissible regardless whether Dr. Bath is testifying as an expert or a lay witness.

the scope of Rule 702 and thus by definition outside of Rule 701.")(quoting United States v. Smith,

640 F.3d at 365).  She also cannot testify to her hypotheses regarding the effect D. Montoya's

condition may have on his future.  See Williams v. Mast Biosurgery USA, Inc., 644 F.3d at 1317-18

("[W]hen a treating physician's testimony is based on a hypothesis, not the experience of treating

the patient, it crosses the line from lay to expert testimony.").  Dr. Bath cannot, therefore, testify to

any of her future projections, including: (i) if D. Montoya's panic attacks will continue or for how

long; (ii) how long D. Montoya may continue to suffer from any mental disease with which she

diagnosed him at time she treated him; (iii) how she anticipates that D. Montoya's condition will

lessen or become more severe; and (iv) the amount of damages D. Montoya will require to treat his

condition.[8]  The Court, therefore, will allow Dr. Bath, D. Montoya's treating physician, to testify

as a lay witnesses to the facts and circumstances of D. Montoya's treatment which are not based on

scientific, technical, or specialized knowledge.

        The deadline to complete discovery in this case was March 10, 2011. The deadline to

disclose expert witnesses was November 10, 2010.  Although the Court has broad discretion with

regard to pre-trial matters, the Court also has a great interest in ensuring that parties comply with

---

        [8]Although the restrictions that the Court is placing on Dr. Bath's testimony may hinder the
Montoyas' full presentation of their case, these restrictions serve the interests of justice and are fair
to both parties.  The Court recognizes that this case is not one in which the plaintiff sought treatment
from an expert witness for the purpose of avoiding rule 26(a)(2)'s requirements.  Dr. Bath was
treating D. Montoya before the Montoyas filed the case.  Nevertheless, the Court also recognizes
that, in addition to failing to disclose these witnesses as experts under rule 26(a)(2), the Montoyas
failed to identify Dr. Baldwin or Dr. Bath in response to any of multiple interrogatories which the
Defendants sent them asking for identification of witnesses.  In light of this failure to identify these
physicians as experts, the Court finds that disallowing the Montoyas' modification to the
scheduling order is required.  Allowing Dr. Bath to testify to her treatment of D. Montoya as a lay
witness, thus allowing the jury to hear from Dr. Bath that D. Montoya sought treatment for mental
health issues after the incident, best serves the interests of justice and is correct under the Federal
Rules of Civil Procedure and the Federal Rules of Evidence.  The Defendants have known of Dr.
Bath from early in the case because the medical records provided indicated her involvement.

the Court's orders, including the scheduling order. The Court is, however, sensitive to the needs of plaintiffs to present their cases to the jury.  The Court will therefore not allow the Montoyas to supplement their discovery, and thereby modify the scheduling order, but finds that the interests of justice are served by allowing Dr. Baldwin to authenticate the note on the stand, rather than mandating a stipulation, and by allowing Dr. Bath to testify to the facts of D. Montoya's treatment.

**IT IS ORDERED** that the Plaintiffs' Motion to Supplement Discovery, filed June 7, 2012 (Doc 42), is granted in part and denied in part.  The Court will not allow Plaintiffs David Montoya and Michael Montoya to supplement their discovery by adding expert witnesses.  The Court will, however, allow Dr. Baldwin, M. Montoya's treating physician,  to lend credibility to M. Montoya's seat belt exemption note by testifying that he signed the note.  The Court will allow Dr. Barbara Bath, Plaintiff David Montoya's treating physician, to testify to her treatment of D. Montoya, but will not permit her to testify about any subjects or opinions outside the scope of testimony about her past treatment of D. Montoya.  Because Dr. Bath is providing testimony as a lay witness under rule 701, she can testify only to the facts of D. Montoya's treatments and lay opinions formed at the time of her treatment of D. Montoya, but such opinions may not be based on scientific, technical, or specialized knowledge.  She cannot, therefore, testify to any diagnosis of D. Montoya's mental health issues or their cause.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Timothy M. Padilla
Ignacio V. Gallegos
Timothy M. Padilla & Associates, P.C.
Albuquerque, New Mexico

-35-

-- and --

Louren M. Oliveros
Gorence & Oliveros PC
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*


Stephanie M. Griffin
Benjamin I. Sherman
  Assistant City Attorneys
City of Albuquerque
Albuquerque, New Mexico

   *Attorneys for the Defendants*