# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAVID MONTOYA and
MICHAEL MONTOYA,

               Plaintiffs,

vs.                                                                                   No. CIV 10-0360 JB/WDS

GERALD SHELDON, an Officer Employed
by the Albuquerque Police Department, a
Subsidiary of the City of Albuquerque,
Individually and in his Official Capacity,
ANGELO LOVATO, an Officer Employed
by the Albuquerque Police Department, a
Subsidiary of the City of Albuquerque,
Individually and in his Official Capacity, and
THE CITY OF ALBUQUERQUE,

               Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Motion in Limine and Memorandum in Support to Exclude any Evidence Regarding Alleged Violation of Police Standard Operating Procedures, filed September 4, 2012 (Doc. 58)("Motion in Limine"). The Court held a hearing on September 19, 2012. The primary issues are: (i) whether Plaintiffs Michael Montoya and David Montoya may offer evidence of Defendants Gerald Shelden's and Angelo Lovato's alleged violations of the Albuquerque Police Department ("APD") standard operating procedures ("SOPs"); and (ii) whether, if Shelden and Lovato offer affirmative evidence of their compliance with the standard operating procedures or their training, the Court will allow the Montoyas to offer the SOPs as evidence to rebut Shelden's and Lovato's testimony. The Court will grant in part and deny in part the Defendants' Motion in Limine. The Court will exclude evidence of Shelden's and Lovato's

alleged violations of APD SOPs and police training, because this evidence is not relevant.  To the extent Shelden and Lovato offer into evidence their compliance with the SOPs and their training at trial, the Court will allow the  Montoyas to introduce evidence of Shelden's and Lovato's alleged violation of the SOPs and their training only as necessary to rebut Shelden's and Lovato's testimony.

## FACTUAL BACKGROUND

The Court has explained the facts of this case in three prior Memorandum Opinion and Orders: (i) the Memorandum and Opinion Order, filed October 7, 2012 (Doc. 83); (ii) the Memorandum Opinion and Order, filed October 12, 2012 (Doc 101); and (iii) the Memorandum and Opinion Order, filed October 29, 2012 (Doc. 110).  The Court incorporates by reference those facts here.  The Court will add here additional pertinent facts for this motion. The primary issues are whether the Montoyas can enter into evidence of any alleged violation of the APD SOPs.

At the scene of Shelden's and Lovato's arrest of the Montoyas, Shelden restrained M. Montoya by placing him in handcuffs and police headgear, and restrained D. Montoya by using OC aerosol spray[1] and handcuffs.  The Montoyas allege that their use of such force in arresting the Montoyas under the circumstances violated the APD SOPs, and Shelden's and Lovato's police training.

## PROCEDURAL BACKGROUND

The Defendants filed this Motion in Limine on September 4, 2012, seeking to exclude evidence regarding any alleged violation of police SOPs under rules 104, 401, 402, and 403 of the Federal Rules of Evidence.  See Motion in Limine at 1.  Shelden and Lovato argue that the Court should exclude reference to any alleged SOPs violations, because "such evidence is irrelevant to the

---

[1]OC aerosol spray stands for "Oleoresin Capsicum" aerosol spray, and is also commonly known as "pepper spray."

Fourth Amendment inquiry."   Motion in Limine at 1-2 (citing <u>Davis v. Scherer</u>, 468 U.S. 183, 194-96 (1984); <u>Tanberg v. Sholtis</u>, 401 F.3d 1151, 1163 (10th Cir. 2005); <u>Medina v. Cram</u>, 252 F.3d 1124, 1133 (10th Cir. 2001); <u>Wilson v. Meeks</u>, 52 F.2d 1547, 1554 (10th Cir. 1995)).   The Defendants assert that proof of Shelden's and Lovato's alleged SOPs violations is not probative whether any of the Montoyas' federal unlawful-arrest, excessive-force, or malicious-prosecution claims, because all of these claims are analyzed under the objective standard involving whether the Defendants acted reasonable under the circumstances.   <u>See</u> Motion in Limine at 2 (citing <u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989)).   The Defendants contend that, should the Court find that evidence of Shelden's and Lovato's alleged SOPs violations is relevant, the Court should still exclude the evidence under rule 403, "because of the risk of confusion of the issues, misleading the jury, and unfair prejudice."   Motion in Limine at 2 (citing <u>Tanberg v. Sholtis</u>, 401 F.3d at 1164 ("Given the minimal probative value of an SOP that merely duplicates the legal standard already under consideration, and the likelihood that the jury could confuse legal and administrative standards, we cannot find that the trial court abused its discretion in excluding the evidence with regard to Plaintiffs' state claims.")).   The Defendants argue that the Court should exclude the SOPs under rule 403:

> [I]n the instant case, Plaintiffs may argue that, in accordance with standard operating procedures, a reasonable officer would have tape recorded the incident involving Plaintiffs and therefore argue and infer that Defendants had the improper state of mind. This evidence will likely confuse and mislead the jury into believing that a violation of standard operating procedures automatically equates to a constitutional violation. Such evidence would undoubtedly unfairly prejudice Defendants.

Motion in Limine at 3.   The Defendants thus move the Court to exclude evidence of alleged SOPs violations under rules 402 and 403, because such evidence is irrelevant, and the danger of unfair prejudice or confusing/misleading the jury substantially outweighs its probative value.   <u>See</u> Motion

-3-

in Limine at 3-4.

On September 17, 2012, the Montoyas filed the Plaintiffs' Response to Defendants' Motion in Limine and Memorandum in Support to Exclude any Evidence Regarding Alleged Violations of Police Standard Operating Procedures [Doc. 58] ("MIL Response"), contending that, while they concede that the alleged SOPs violations are not relevant to any constitutional violations, they are "relevant for the jury to put into context and fully understand the significance of the Defendants' actions in detaining, arresting, charging and prosecuting Plaintiffs." MIL Response at 4. The Montoyas state that, once the jury is informed of the applicable SOPs, any evidence of alleged SOPs violations will be offered to show bias, and impeach Shelden's and Lovato's credibility. See MIL Response at 3. The Montoyas intend to inquire into Shelden's and Lovato's training and the SOPs concerning: (i) arrests and detentions; (ii) "documenting information and evidence in reports, criminal complaints;" (iii) "investigating, charging and arresting individuals accused of seatbelt violations, resisting arrest and disorderly conduct;" (iv) the use of "OC aerosol restraint spray and the use of restraint devices, including handcuffs and face masks;" and (v) "courtroom testimony and demeanor." MIL Response at 3. They assert that the SOPs are relevant and important, for example, "to show what circumstances warrant the issuance of any particular traffic citation, the removal of a suspect from his vehicle and the use of OC spray." MIL Response at 4. Evidence of the alleged SOP violations are relevant to bias and credibility, they argue, because such evidence allows "the jury to consider whether the Defendants' version of what happened is remotely credible and whether the Defendants are biased against Defendants for any reason." MIL Response at 5. Similarly, the Montoyas contend that SOPs and training regarding courtroom demeanor is relevant to Shelden's and Lovato's in-court testimony. See MIL response at 5.

At the hearing, the Court cited to the Montoyas its opinion in Mata v. City of Farmington,

798 F. Supp. 2d 1215 (D.N.M. 2011)(Browning, J.), advising them that, the Court early on thought

that there "was some room for SOPs, but then . . . [The Honorable Michael W.] McConnell[, Circuit

Judge, United States Court of Appeals for the Tenth Circuit] has pretty much shut the door."

Transcript of Hearing at 49:7-11 (taken September 19, 2012)(Court)("Tr.").[2]  The Court stated that,

under Tenth Circuit's precedent, it could not allow SOPs or other training into evidence.  <u>See</u> Tr.

at 49:11-15 (Court).  The Montoyas stated that they were concerned that, if Shelden or Lovato got

on the stand and testified that they "did everything right," without the SOPs and training coming into

evidence, the Montoyas could not impeach their testimony.  Tr. at 50:23-25 (Oliveros).  The Court

stated that, should Shelden or Lovato do so and open the door for impeachment, such offered

testimony would present a different situation, and the Court would revisit exclusion of the evidence

at that time.  <u>See</u> Tr. at 51:1-8 (Court).  The Montoyas argued that they believe it is important for

the jury to be able to see what Shelden and Lovato did and did not do when they had the opportunity.

<u>See</u> Tr. at 51:9-18 (Oliveros).  The Court assured the Montoyas that asking Shelden and Lovato if

they had alternatives was appropriate on cross-examination, but the Montoyas could not tie the

alternatives or their actions to SOPs or to their training.  <u>See</u> Tr. at 51:19-52:5 (Court, Oliveros).

The Montoyas stated that it was their impression Shelden and Lovato wanted to offer the Reactive

Control Model, which is a part of the APD SOPs, and so they believed that the Court should exclude

the Reactive Control Model or allow the Montoyas to cross-examine Shelden and Lovato on the

model.  <u>See</u> Tr. at Tr. at 52:11-17 (Oliveros).  The Court responded that, to the extent Shelden and

Lovato wish to offer evidence of the Reactive Control Model and their training, they open the door

to the Montoyas cross-examining them to the same extent on the Model and their training with the

---

[2] The Court's citations to the transcript of the hearing refers to the court reporter's original,
unedited version. Any final transcript may have slightly different page and/or line numbers.

Model.  <u>See</u> Tr. at 52:18-23 (Court).

## RULE 403 OF THE FEDERAL RULES OF EVIDENCE

Rule 403 provides that, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Unfair prejudice in the rule 403 context "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403 advisory committee's note.  "The burden under Rule 403 is on the party opposing admission, who must show that the probative value is substantially outweighed by the danger of unfair prejudice."  <u>United States v, Delgado</u>, No. CR 05-920, 2006 U.S. Dist. LEXIS 29150, at *9 (D.N.M. Feb. 10, 2006)(Browning, J.)(quoting <u>United States v. Tse</u>, 375 F.3d 148, 164 (1st Cir. 2004)).  <u>See</u> <u>McEwen v. City of Norman</u>, 926 F.2d 1539, 1549-50 (10th Cir. 1991)(stating that unfair prejudice "cannot be equated with testimony which is simply unfavorable to a party.  It must be unfair in the sense that it would be misleading and not aid and assist the jury in making a material determination in the case.").

## RELEVANT LAW REGARDING SOPS IN CIVIL RIGHTS CASES

In <u>Whren v. United States</u>, 517 U.S. 806 (1996), the Supreme Court of the United States examined the application of SOPs to traffic-stop cases as a method by which a court could determine if an officer made a pretextual stop.  <u>See</u> 517 U.S. at 813-14.  In concluding that the Fourth Amendment's reasonableness requirement "allows certain actions to be taken in certain circumstances, whatever the subjective intent," the Supreme Court stated:

> Indeed, it seems to us somewhat easier to figure out the intent of an individual officer than to plumb the collective consciousness of law enforcement in order to determine whether a "reasonable officer"  would have moved to act upon a traffic

violation.  While police manuals and standard procedures may sometimes provide objective assistance, ordinarily one would be reduced to speculating about the hypothetical reaction of a hypothetical constable -- an exercise  that might be called virtual subjectivity.

Moreover, police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and time to time.  We cannot accept that the search and seizure protections of the Fourth Amendment are so variable and can be turned upon trivialities.

517 U.S. at 815 (citations omitted).  See United States v. Botero-Ospina, 71 F.3d 783, 787-88 (10th Cir. 1995), cert. denied, 518 U.S. 1007 (1999).

The Supreme Court has stated that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provisions."  Davis v. Scherer, 468 U.S. 183, 194 (1984)(footnote omitted).  Consistent with other circuit courts, the Tenth Circuit holds that the violation of state law and SOPs will not turn an otherwise constitutional use of force into a violation of § 1983.  See Tanberg v. Sholtis, 401 F.3d at 1167 ("Even if [the defendant officer] violated the SOPs, this violation would not create a violation of a clearly established constitutional right ex nihilo.")(McConnell, J.); Medina v. Cram, 252 F.3d at 1133 (excluding expert affidavit which stated that the "officers' use of force did not conform with accepted police guidelines and practices," because "claims based on violations of state law and police procedure are not actionable under § 1983.")(Tacha, J.); Romero v. Bd. of Cnty. Comm'rs of Cnty. Lake, 60 F.3d 702, 704 (10th Cir. 1995)("[V]iolations of state law and police procedure generally do not give rise to a § 1983 claim.")(citations omitted)(Anderson, J.), cert. denied, 516 U.S. 1073 (1996); Wilson v. Meeks, 52 F.3d at 1554 ("[V]iolation of a police department regulation is insufficient for liability under section 1983.").  See also Greenridge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991)(upholding the trial court's decision to exclude officer's failure to follow standard arrest procedures, because it was not relevant to whether the officer acted

reasonably in using force); Diaz v. Salazar, 924 F. Supp. 1088, 1097 (D.N.M. 1996)(Hansen, J.)("The fact that their conduct may not have conformed with police regulations or training does not operate to create constitutional liability under Section 1983.").

The clearly established law also does not permit a plaintiff to establish a constitutional violation with evidence that the officers violated SOPs. The clearly established law requires the exclusion of any evidence regarding the violation of SOPs, because such evidence is irrelevant to the Fourth-Amendment inquiry. In Tanberg v. Sholtis, Judge McConnell discussed the propriety of admitting SOPs as evidence of a constitutional violation in an excessive force, and an assault-and-battery, case. The Tenth Circuit held that the proffered SOP was irrelevant to the issues in the case:

> In the exclusionary rule context, the Supreme Court has rejected the use of local police regulations as a standard for evaluating constitutionality of police conduct, on the ground that such a "basis of invalidation would not apply in jurisdictions that had a different practice." Whren v. United States, 517 U.S. 806, 815 (1996). That logic would seem to apply equally to damage suits under § 1983. This Court has consistently held that the violation of police regulations is insufficient to ground a § 1983 action for excessive force. Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005); Medina[ v. Cram], 252 F.3d at 1133; Romero v. B[]d[.] of C[]nty[.] Com[m]'rs of County of lake, State of Colo., 60 F.3d 702, 705 (10th Cir. 1995); Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995). . . . That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant. If Officer Sholtis violated the SOP governing the use of force in effecting arrest, that fact might well be pertinent to the Albuquerque Police Department's future decisions to promote, retain, or discipline him; it is not relevant to determining if Plaintiff's arrest violated the reasonableness requirement of the Fourth Amendment.

Tanberg v. Sholtis, 401 F.3d at 1163-64. As the Tenth Circuit explained:

> Although plaintiffs frequently wish to use administrative standards, like the Albuquerque SOPs, to support constitutional damages claims, this could disserve the objective of protecting civil liberties. Modern police departments are able -- and often willing -- to use administrative measures such as reprimands, salary adjustments, and promotions to encourage a high standard of public service, in excess of the federal constitutional minima. If courts treated these administrative standards as evidence of constitutional violations in damages actions under § 1983,

this would create a disincentive to adopt progressive standards.  Thus, we decline Plaintiffs' invitation here to use the Albuquerque Police Department's operating procedures as evidence of the constitutional standard.

401 F.3d at 1164.

In Medina v. Cram, Judge Tacha reviewed the relevance of SOPs to a Fourth-Amendment excessive force claim.  The police responded to a call regarding Medina's refusal to return to jail on a bail bond violation and statement that he was armed with a gun.  See 252 F.3d at 1126.  After their arrival, the police tried to convince Medina to leave his house peacefully.  See 252 F.3d at 1126.  Instead, Medina told the officers that he needed more time, was suicidal, and was armed with a handgun.  See 252 F.3d at 1126.  Ultimately, Medina "emerged from the house with his left hand in a cup and his right hand wrapped in a towel concealing a staple gun, which Mr. Medina intended as a representation of a weapon."  252 F.3d at 1126.  Although ordered to stop, Medina "walked" toward and onto the street.  252 F.3d at 1126.  The officers' use of bean-bag rounds did not stop Medina's movement.  See 252 F.3d at 1126.  After the bean-bag rounds failed to stop Medina, "an officer released an attack dog, which bit [Medina] and released, returning to the officer."  252 F.3d at 1126.  The "attack dog was released a second time," causing Medina to drop to the ground and expose the staple gun.  252 F.3d at 1126.  As he dropped to the ground, Medina pointed the staple gun in the direction of other officers.  See 252 F.3d at 1126.  Two officers shot Medina five times. See 252 F.3d at 1126.

In response to the officers' assertion of qualified immunity, Medina submitted an affidavit of an expert who opined that the officers' use of force did not conform with accepted police guidelines and practices, and was therefore excessive.  See 252 F.3d at 1133.  The expert's affidavit did not persuade the Tenth Circuit:

We have, of course, recognized that claims based on violations of state law and

> police procedure are not actionable under § 1983.  <u>Romero</u>, 60 F.3d at 705 (state law
> and police procedure); <u>Wilson I</u>, 52 F.3d at 1554 (police department regulation); <u>see
> also</u> <u>Davis v. Scherer</u>, 468 U.S. 183, 194-96 (1984)(rejecting the argument that §
> 1983 liability may be based solely on a violation of a state statute or regulation).

<u>Medina v. Cram</u>, 252 F.3d at 1133.

In the cases in which the Court has addressed this issue, most, and all recent, cases have

ruled that evidence regarding the violation of police procedure is not admissible in a § 1983

excessive force case.  <u>See</u> <u>Mata v. City of Farmington</u>, 798 F. Supp. 2d at 1219 (excluding, under

rule 402, "evidence that the Defendant Officers did not follow SOPs and police training, because

this evidence is not relevant"); <u>Jonas v. Bd. of Comm'rs of Luna Cnty.</u>, 699 F. Supp. 2d 1284, 1299

(D.N.M. 2010)(Browning, J.)("The clearly established law also does not permit a plaintiff to

establish a constitutional violation with evidence that the officers violated SOPs and their

training."); <u>Vondrak v. City of Las Cruces</u>, No. CIV 2005-0172 JB/LAM, 2009 WL 3241555, at *14

(D.N.M. Aug. 25, 2009)(Browning, J.)(concluding that "expert testimony that refers to SOPs or

other established law-enforcement standards" was inadmissible under Tenth Circuit precedent);

<u>Chamberlin v. City of Albuquerque</u>, 2005 U.S. Dist. LEXIS 21910, at *12 (Browning, J.)("[U]nder

<u>United States v. Marquez</u> and <u>Tanberg v. Sholtis</u>, evidence of the SOPs is irrelevant to whether

[defendant officer] acted objectively reasonably.  Accordingly, the Court will preclude [plaintiff]

from offering testimony or evidence about SOPs on his § 1983 claim.").

In <u>Taylor v. Hudson</u>, No. CIV 02-0775 JB/RHS, 2003 U.S. Dist. LEXIS 26736 (D.N.M.

Nov. 21, 2003)(Browning, J.), which the Court decided before the Tenth Circuit's decisions in

<u>Marquez v. City of Albuquerque</u>, 399 F.3d 1216 (10th Cir. 2005), the Court found:

> The use of SOP evidence with respect to the reasonableness of the amount of force
> actually used in effecting the arrest implicates the rule of law that a violation of
> police procedures cannot serve as the basis for a constitutional violation.
> Accordingly, the Court would caution [the plaintiff] that, while he may be allowed

> to argue that the Defendants' use of force was unreasonable because [the Defendant Officer] was the initial aggressor, he cannot argue at trial that such force was unreasonable because [the Defendant Officer] violated a SOP requiring him to distance himself from an aggressive person.

Taylor v. Hudson, 2003 U.S. Dist. LEXIS 26736, at *16.  The Court recognized that "courts have consistently held that a violation of an SOP is not equivalent to a constitutional violation," but noted that -- at the time of the opinion -- SOP evidence was not categorically excluded from excessive force cases.  2003 U.S. Dist. LEXIS 26736, at *17-18 (noting that Medina v. Cram, Romero v. Bd. of Cnty. Cmm'rs, and Bella v. Chamberlain, 24 F.3d 1251, 1256 n. 7 (10th Cir. 1994) "do not unequivocally preclude the introduction of SOP evidence in excessive force cases.").  The Court concluded that Tenth Circuit precedent clearly precluded admission of  the SOPs to the extent the plaintiff wished to offer them as evidence of less intrusive alternatives to the amount of force used. 2003 U.S. Dist. Lexis 26736, at *18.  The Court distinguished introduction of the SOPs for purposes of assessing the reasonableness of the force used, opining that it would be permissible to admit the SOPs for this limited reason if two requirements were met:

> Evidence related to the appropriateness of the amount of force used is a different issue. This evidence would need to be unrelated to less intrusive alternatives. [The Plaintiff] would then face the additional burden of establishing that the SOP in question was designed or adopted for the benefit and protection of persons like himself.

2003 U.S. Dist. Lexis 26736, at *20 (citing Scott v. Henrich, 39 F.3d 912, 915-16 (9th Cir. 1994)). The Court concluded that it would presume any evidence of SOPs would be inadmissible; however, if the plaintiff could present a specific SOP to the Court that met the two requirements above, the Court would "consider the appropriateness of such evidence."  2003 U.S. Dist. LEXIS 26736, at *21.

Two years later, in Chamberlin v. City of Albuquerque, the primary issue was whether the

-11-

Court should allow the plaintiff, Chamberlain, to introduce the APD's SOPs. See 2005 U.S. Dist. LEXIS 21910, at *1-2. Because of two recent Tenth Circuit decisions, the Court granted the defendant police officer's motion in limine to exclude the SOPs. The Court, after reviewing the two recent decisions pertaining to SOP admissibility that the Tenth Circuit decided after the Court's decision in Taylor v. Hudson -- Tanberg v. Sholtis and Marquez v. City of Albuquerque -- excluded any evidence or testimony pertaining to SOPs. The Court stated that, in light of these recent Tenth Circuit decisions, and in light of those holdings, it would not allow the plaintiff to offer evidence or testimony of the APD's SOPs. In light of the recent Tenth Circuit precedent, the Court, contrary to its decision in Taylor v. Hudson, held that the plaintiff could not introduce the APD's SOPs to support the allegation that the defendant officer acted unreasonably in directing his police service dog to attack the plaintiff in violation of his Fourth-Amendment rights. See 2005 U.S. Dist. LEXIS 21910, at *2. Specifically, the Court would not allow the plaintiff to introduce SOPs that he had provided to the Court on use of force, use of canines, response to the mentally ill/suspected mentally ill, and rights of onlookers. See 2005 U.S. Dist. LEXIS 21910, at *2.

The Court in Chamberlin v. City of Albuquerque acknowledged that, although both of the Tenth Circuit decisions were distinguishable from the facts in Chamberlin v. City of Albuquerque in that the SOPs which the plaintiff sought to introduce in Chamberlin v. City of Albuquerque were different than those at issue in the two Tenth Circuit cases, and that, unlike Tanberg v. Sholtis, there was no suggestion that the plaintiff in Chamberlin v. City of Albuquerque also sought to introduce testimony whether the police department disciplined the defendant police officer for violating any SOP, the language of the Tenth Circuit's cases was sufficiently broad and sweeping to encompass the SOPs at issue in Chamberlin v. City of Albuquerque. The Court stated that, under United States v. Marquez and Tanberg v. Sholtis, evidence of the SOPs was irrelevant to whether the Defendant

-12-

Police Officer acted objectively reasonably.  Accordingly, the Court precluded the plaintiff from offering testimony or evidence about the SOPs on his § 1983 claim.

## LAW REGARDING RULE 608 EVIDENCE

Rule 608 of the Federal Rules of Evidence provides mechanisms for attacking witnesses' character for truthfulness or untruthfulness.  See Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 1132505, at *5 (D.N.M. Mar. 20, 2012)(Browning, J.); United States v. Huerta-Rodriguez, 83 Fed. R. Evid. Serv. 681, 2010 WL 3834061, at *7 (D.N.M. 2010)(Browning, J.).  Rule 608(a) states:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character.  But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a).  The truthfulness or untruthfulness of a witness may be attacked by opinion or reputation evidence without ever proffering evidence of a good character for truthfulness.  See United States v. Holt, 486 F.3d 997, 1002 (7th Cir. 2007)(noting that, while it is within the trial court's discretion to prohibit cross-examination of a police officer whether he had been suspended to call into question his credibility, the plaintiff "could have used Rule 608(a) and called a member of the department to testify directly about his opinions or reputation of [the credibility of the officer].").  To establish a proper foundation for the opinion or reputation testimony, a witness must show: "such acquaintance with the person under attack, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded."  United States v. Rios, 92 F.3d 1519, 1529 (10th Cir. 1996), overruled on other grounds by United States v. Flowers, 464 F.3d 1127 (10th Cir. 2006)(quoting United States v. Bedonie, 913 F.2d 782, 802 (10th Cir. 1990)).

-13-

Rule 608(b) provides the rule for admission of specific instances of conduct:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.  But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> > **(1)** the witness; or
> >
> > **(2)** another witness whose character the witness being cross-examined has testified about.

Fed. R. Evid. 608(b).  "Under Federal Rule of Evidence 608(b), specific unrelated instances of a witness's prior misconduct may be used to impeach the witness at the discretion of the court, however, only to the extent the misconduct reflects on the witness's character for truthfulness."

United States v. Beltran-Garcia, 338 F. App'x 765, 770 (10th Cir. 2009)(unpublished).  "Though Rule 608 does not explicitly specify how the trial court should exercise its discretion, the discretion must be exercised within the ambit of the other rules of evidence, including Rules 401, 402, and 403, which address the relevance and probative value of possible evidence."  United States v. Beltran-Garcia, 338 F. App'x at 770.

> Although 608(b) of the Federal Rules of Evidence does state that specific instances of misconduct may be admissible to impeach a witness, that rule does not require or imply that every negative bit of evidence existing concerning a witness may be dragged into a case no matter how remote or minor the alleged misconduct.

United States v. Lafayette, 983 F.2d 1102, 1106 (D.C. Cir. 1993).

Rule 608(b)'s exclusion of extrinsic evidence does not apply to using extrinsic evidence to contradict a witness's testimony at trial.  See 2 S. Saltzburg, M. Martin, D. Capra, Fed. Rules of Evidence Manual § 608.02[7], at 608-17 (9th ed. 2006)("[E]xtrinsic evidence offered for contradiction is not barred by Rule 608(b) . . . .").  Rule 608 was amended in 2003 "to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that

evidence is to attack or support the witness' character for truthfulness," and not "to bar extrinsic evidence for bias, competency and contradiction impeachment."  Fed. R. Evid. 608 advisory committee's note to 2003 amendment (emphasis added).  See S. Saltzburg, M. Martin, D. Capra, supra § 608.02[7], at 608-16  ("The exclusionary principle of Rule 608(b) applies only . . . to impeach the witness' character for veracity.  If the specific act is offered to impeach the witness on other grounds, then the absolute preclusion of extrinsic evidence is inapplicable.").  The Tenth Circuit has noted: "This rule [which] precludes the admission of extrinsic evidence . . . does not apply, however, when extrinsic evidence is used to show that a statement made by a defendant on direct examination is false. . . ."  United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)(citing 27 C. Wright & V. Gold, Fed. Practice and Procedure § 5096, at 546-47 (1990)).  "If there is evidence that specifically contradicts a witness's testimony, impeachment evidence is admissible to demonstrate that the witness lacks credibility and has a propensity for lying." United States v. Cerno, 529 F.3d 926, 944 (10th Cir. 2008).   "This doctrine, known as specific contradiction, allows such impeachment even if the evidence elicited ordinarily might be collateral or otherwise inadmissible."  Montoya v. Shelden, No. CIV 10-0360 JB/WDS, 2012 WL 4950707, at *12 (D.N.M. Oct. 12, 2012)(Browning, J.)(quoting United States v. Crockett, 435 F.3d 1305, 1313 (10th Cir. 2006))(internal quotations and alterations omitted).  Thus, an opposing party may not prove up past specific instances of truthfulness or untruthfulness extrinsically unless and until the witness has offered false statements on the stand.  See Montoya v. Shelden, 2012 WL 4950707, at *22  ("Should Lovato disclaim any of the information regarding his providing false information to Chavez or the investigation board, the Court will allow the Montoyas to prove up the lies

extrinsically. . . .").[3]

## ANALYSIS

The Court will grant in part and deny in part the Defendants' Motion in Limine.  The Court will exclude evidence that Shelden and Lovato did not follow SOPs and police training, because this evidence is not relevant.  If, at trial, Shelden and Lovato choose to offer evidence of the Reactive

---

[3]In its previous Memorandum Opinion and Order, the Court concluded that the Montoyas should be permitted to inquire about a 2011 traffic accident involving Lovato and one of the Montoyas' witnesses on cross-examination, because Lovato was untruthful with the witness at the scene of the accident and untruthful with fellow officers in a follow-up investigation.  See Montoya v. Shelden, 2012 WL  4950707, at *21.

> The Court will therefore allow the Montoyas to cross-examine Lovato as to the following: (i) that he provided false information to Chavez at the scene of an accident, (ii) that he represented to Chavez that he was on duty at the time of the accident when he was not; (iii) that he provided her with a false CAD number; and (iv) that he provided false information to the internal-affairs investigation board during the course of the subsequent investigation. The Court will not permit the Montoyas to inquire any further into the internal-affairs investigation, present evidence that Lovato was criminally charged as a result of the incident, or present evidence of the subsequent criminal charges.

2012 WL 4950707, at *21.  The Court further provided: "If, however, Lovato does not answer the questions truthfully . . . the Court will allow the Montoyas to call [a witness] . . . to prove the conduct extrinsically."  2012 WL 4950707, at *22.  During the course of the trial, the Montoyas called Lovato as a witness during their case-in-chief.  At the conclusion of Lovato's direct examination, the Montoyas inquired about his 2011 accident, his untruthful statements to the other driver, and his untruthful statements in the follow-up investigation.  See Transcript of Trial 290:14-291:25 (taken October 9, 2012)(Oliveros, Lovato).  The Court notes that the line of questioning was improper for direct-examination under rule 608(b), even though Lovato is an adverse witness.  See 28 C. Wright & J. Gold, Fed. Practice and Procedure § 6119, at 125-26 (2d ed. 2012)(noting that "specific instances . . . offered during direct examination probably should not be allowed . . . . where, under Rule 611(c), a direct examiner is permitted to conduct the questioning of adverse or hostile witnesses as if on cross-examination by using leading questions").  Although the Court's previous rulings directed that inquiry about Lovato's prior specific instances of conduct was to be made on cross-examination, because the Defendants did not object at trial to the Montoyas' line of questioning, the Court did not *sua sponte* intervene.  The Defendants may have decided that the order of the evidence did not matter once the Court deemed the motion in limine to keep the witnesses and written report out, and the Defendants decided that Lovato had to testify to win the case.

-16-

Control Model, and their compliance with the chart, Shelden and Lovato will open the door to the

Montoyas to cross-examine them about their non-compliance with their training and with the

Reactive Control Model.  If Shelden and Lovato go further in testifying that they complied with the

SOPs or their training, the Court will allow the Montoyas to impeach their credibility by offering

evidence of the SOPs, and Shelden's and Lovato's training, to the extent necessary to rebut

Shelden's and Lovato's testimony.

I.      **THE COURT WILL EXCLUDE EVIDENCE OF SOPS AND POLICE TRAINING.**

        The Court will exclude any evidence of Shelden's and Lovato's alleged violation of the APD

SOPs or their training, or other generally accepted SOPs and police training.  The Court's analysis

in Mata v. City of Farmington is on point:

> The clearly established law requires the exclusion of any evidence regarding the
> violation of SOPs and training, because such evidence is irrelevant to
> Fourth-Amendment inquiry." 699 F. Supp. 2d at 1299 (discussing Tanberg v. Sholtis
> and Medina v. Cram).  Given the controlling law, the Court finds that evidence of
> violations of SOPs and training is irrelevant to whether The Montoyas's and
> J.A.M.'s rights under the Fourth Amendment were violated.  See Tanberg v. Sholtis,
> 401 F.3d at 1163-64 ("That an arrest violated police department procedures does not
> make it more or less likely that the arrest implicates the Fourth Amendment, and
> evidence of the violation is therefore irrelevant.").  Because this evidence is not
> relevant, the Court finds that this evidence is "not admissible," and the Court will
> exclude this evidence.  Fed. R. Evid. 402.

798 F. Supp. 2d at 1234-35.

        The Montoyas argue that their instant case is distinguishable, because evidence of Shelden's

and Lovato's alleged SOPs and training violations here are not offered to show their actions were

unreasonable, but rather the evidence is  "relevant for the jury to put into context and fully

understand the significance of the Defendants' actions in detaining, arresting, charging and

prosecuting Plaintiffs."  MIL Response at 4.  The Montoyas explain that "only through permitting

law enforcement witnesses to explain standard operating procedures and practices will the jury

understand the Defendants' actions in detaining, arresting and charging Plaintiffs."  MIL Response at 4.  Putting Shelden's and Lovato's actions of detaining, arresting, and charging the Montoyas in the context of the APD SOPs -- which are effectively the APD police officers' guidelines for what an ordinary or reasonable police officer should do in certain circumstances -- would be relevant only to show that Shelden and Lovato did not act as they should have in the particular context.  In other words, the Montoyas hope the jury will use the APD SOPs to find that Shelden and Lovato did not conform their conduct to the SOPs, and thus acted unreasonably under the circumstances.  Thus, the Montoyas argument does not survive Tenth Circuit law.  The Court will therefore exclude evidence of Shelden's and Lovato's alleged SOPs violations as irrelevant.

The Court on four occasions has made similar decisions regarding training.  See Mata v. City of Farmington, 798 F. Supp. 2d at 1219 (2011)("The Court will exclude evidence that the Defendant Officers did not follow SOPs and police training, because this evidence is not relevant."); Jonas v. Bd. of Comm'rs of Luna Cnty, 699 F. Supp. 2d at 1299 (2010)("The clearly established law requires the exclusion of any evidence regarding the violation of SOPs and training, because such evidence is irrelevant to Fourth-Amendment inquiry.")(emphasis added); Vondrak v. City of Las Cruces, 2009 WL 3241555, at *17 (2009)("The Court will . . . prohibit any testimony that is framed up in reference to 'national' or 'well-established' practices"); Chamberlin v. City of Albuquerque, 2005 WL 2313527, at *1 (granting "the Defendant's Motion in Limine No. II: The Exclusion of Evidence at Trial Regarding the Officers' Use of Force in Prior and Subsequent, Unrelated Incidents, Police Standard Operating Procedures, Training, and Less Intrusive Alternatives").  The Court based this conclusion on the Tenth Circuit's opinions in Marquez v. City of Albuquerque (2005) and Tanberg v. Sholtis (2005).  The Court did not think the Tenth Circuit would categorically disallow SOPs, but let in evidence of training.  Both exist to tell officers what should be done in particular

circumstances.  There did not appear to be a sound reason to distinguish between SOPs and training.

Tenth Circuit precedent appears to make that distinction, however, and permit the admissibility of training as evidence of reasonableness under the Fourth Amendment.  In two unpublished opinions, Gianetti v. City of Stillwater, 216 F. App'x 756 (10th Cir. 2007), and Hurley v. City of Owasso, 2012 WL 4458342 (10th Cir. Sept. 27, 2012), the Tenth Circuit appears to  make inconsistent rulings on whether training evidence is admissible for purposes of determining whether a defendant officer's actions were objectively reasonable.  In Gianetti v. City of Stillwater (2007), the Tenth Circuit held that Tanberg v. Sholtis precludes a plaintiff from introducing evidence of police department training materials as evidence of a police officers' reasonableness.  Gianetti v. City of Stillwater, 216 F. App'x at 766 ("Giannetti also relies upon the training materials at the Stillwater police department as further evidence of the officers' unreasonable response. However, our broad ruling in Tanberg v. Sholtis . . . forecloses this argument.")(unpublished).  On the other hand, in its most recent opinion analyzing the reasonableness of an officer's use of force, although unpublished, the Tenth Circuit held that there was no genuine issue as to the material fact whether the amount of force was reasonable, because "[t]here is no evidence that the officers performed the arm bar in any way other than they had been trained to do, or that they used force beyond what is commonly used for this maneuver."  Hurley v. City of Owasso, 2012 WL 4458342, at *4 (10th Cir. Sept. 27, 2012)(unpublished). In the only published Tenth Circuit opinion analyzing whether training is admissible as evidence of reasonableness under the Fourth Amendment, the Tenth Circuit held that training evidence is admissible, stating that "the reasonableness of an officer's actions must be assessed in light of the officer's training."  Weigel v. Broad, 544 F.3d 1143, 1155 (10th Cir.

2008).[4]

In Weigel v. Broad, the Honorable Stephanie K. Seymour, Senior Circuit Judge, writing the majority opinion, remanded the district court's summary judgment in favor of the defendant police officers against a plaintiff alleging wrongful death from asphyxiation.  The Tenth Circuit held that an issue of fact existed whether the defendant officers used excessive force in causing the asphyxiation and that the defendant officers, if they did what the plaintiff alleged, violated clearly established law, precluding qualified immunity.  See 544 F.3d at 1147.  In reviewing the facts, Judge Seymour stated that "[t]he risk of such asphyxiation should have been familiar to [the] Troopers . . . ."  544 F.3d at 1150.  Judge Seymour noted that, "[d]uring the troopers['] use-of-force training at the Wyoming Law Enforcement Academy (WLEA), they were provided with extensive written materials, oral lectures, and audiovisual presentations regarding the dangers of Sudden Custody Death Syndrome and positional asphyxiation."  544 F.3d at 1150.

In regards to whether the defendant officers acted reasonably in arresting the plaintiff, the

---

[4]The Defendants filed their Motion in Limine on September 4, 2012.  The Montoyas filed their MIL Response on September 17, 2012.  The Court held a hearing on September 19, 2012, and, at the hearing, based on its prior rulings, gave an oral ruling precluding introduction of evidence of Shelden's and Lovato's training.  See Tr. at 49:11-15 (Court).  The trial began on October 9, 2012, and lasted until October 12, 2012.  The parties in this case did not direct the Court's attention to Weigel v. Broad or Huntley v. City of Owasso in their briefs, at oral arguments, or at trial.  Subsequent to the jury trial in this case, the parties in a separate, unrelated criminal excessive-force case directed the Court's attention to the Tenth Circuit's unpublished opinion in Huntley v. City of Owasso for the proposition that training is relevant to the Fourth Amendment reasonableness inquiry and admissible in excessive-force cases.  The Court discovered Weigel v. Broad during its research concerning whether the Tenth Circuit distinguishes evidence of training from evidence of SOPs violations.  The Court concludes that Weigel v. Broad changes the Court's analysis to exclude evidence of Shelden's and Lovato's training.  The Tenth Circuit's unpublished opinions Gianetti v. Stillwater and in Huntley v. City of Owasso are not binding precedent.  See 10th Cir. R. App. P. 32.1(A); United States v. Lyons, 510 F.3d 1225, 1233 n. 2 (10th Cir. 2007)("Unpublished opinions are not binding precedent . . . . We mention [an unpublished opinion] as we would an opinion from another circuit, persuasive because of its reasoned analysis.").

majority, through Judge Seymour, held that there were factual issues regarding the police officers'

reasonableness, based at least in part on information included in the training materials:

> First, there is evidence a reasonable officer would have known that the pressure
> placed on Mr. Weigel's upper back as he lay on his stomach created a significant risk
> of asphyxiation and death. His apparent intoxication, bizarre behavior, and vigorous
> struggle made him a strong candidate for positional asphyxiation.  And WLEA
> training materials made clear that the pressure applied to Mr. Weigel's upper torso
> would suffice to cause his suffocation.

544 F.3d at 1152 (citing Cruz v. City of Laramie, 239 F.3d 1183 (10th Cir. 2001))(internal citations

omitted).  In discussing whether the law was clearly established that a police officer conducting an

arrest must be cognizant of possible asphyxiation, Judge Seymour reasoned that the training

materials proved the law was clearly established, because the Tenth Circuit's opinion in Cruz v. City

of Laramie "was apparently the reason for the extensive WLEA training on positional asphyxia."

544 F.3d at 1154.  Judge Seymour thus concluded:

> If Cruz had not been handed down, perhaps Wyoming troopers would not have
> received training on positional asphyxia and would be uninformed about the danger.
> But the reasonableness of an officer's actions must be assessed in light of the
> officer's training. The defendants' training informed them that the force they used
> upon Mr. Weigel produced a substantial risk of death. Because it is clearly
> established law that deadly force cannot be used when it is unnecessary to restrain
> a suspect or secure the safety of officers, the public, or the suspect himself, the
> defendants' unnecessary use of deadly force violated clearly established law.

Weigel v. Broad, 544 F.3d at 1155.  Judge Seymour, however, never distinguishes, overrules, or

cites Tanberg v. Sholtis or Gianetti v. City of Stillwater.

The Honorable Terrence L. O'Brien, Circuit Judge, in his dissenting opinion, disagreed that

training was relevant to whether the officers' actions were reasonable under the Fourth Amendment

analysis.

> I disagree that training has any relevancy in the qualified immunity analysis. See,
> e.g., Davis v. Scherer, 468 U.S. 183, 194 & n. 12, 104 S.Ct. 3012, 82 L.Ed.2d 139
> (1984)("Officials sued for constitutional violations do not lose their qualified

> immunity merely because their conduct violates some statutory or administrative provision ... unless that statute or regulation provides the basis for the provision sued upon."); Tanberg v. Sholtis, 401 F.3d 1151, 1159-60 (10th Cir.2005)("Even if it were clear that Officer Sholtis had violated the [Albuquerque Police Department standard operating procedures], that violation would not transform an arrest supported by probable cause into an unconstitutional seizure."); Herring v. Keenan, 218 F.3d 1171, 1180 (10th Cir.2000)("[W]ithout a stronger indication from the courts that a reasonable probation officer in Keenan's position would have known that she was violating Herring's constitutional rights by disclosing his HIV status, rather than simply violating an internal policy, we cannot say that Keenan violated Herring's clearly established constitutional right to privacy.").

544 F.3d at 1167 n.19 (O'Brien, J., dissenting).  Judge O'Brien opined that training is largely irrelevant, because it either restates the clearly established law, or it prescribes best practices beyond that which the law requires:

> At a minimum, instruction regarding behavioral standards imposed upon the police by a court decision in the relevant jurisdiction would be required because that is, by definition, clearly established law. Beyond that, training might include instruction on procedures or best practices, seeking to impart skills and guidelines useful to officers in effectively and safely performing their duties. The training may well reflect value judgments about matters beyond what established law requires. But the law dictates officer training, not the other way around.

544 F.3d at 1173.  Thus, Judge O'Brien concludes that "an officer's training (beyond explaining clearly established law) is irrelevant to the analysis." 544 F.3d at 1173-74.

In Hurley v. City of Owasso, the Tenth Circuit did not articulate its reasoning why the fact that "[t]here is no evidence that the officers performed the arm bar in any way other than they had been trained to do, or that they used force beyond what is commonly used for this maneuver," established that there is no issue whether the amount of force used was objectively reasonable as a matter of law.  2012 WL 4458342, at *4.  The Tenth Circuit, as in Weigel v. Broad, did not overrule Gianetti v. City of Stillwater, distinguish Tanberg v. Sholtis, or discuss or cite these cases in its analysis.  Nor did it give any reasoning why training was relevant to its holding that the amount of force that the officers used in conducting the arm bar and leg sweep to effectuate the arrest was

objectively reasonable.  Rather, the only mention of the defendant officers' training was in its discussion whether "the suspect posed a threat," wherein the Tenth Circuit noted that the underlying incident was a domestic violence call and that, "[i]n their training, the officers had been told that 'domestic violence calls are among the most dangerous . . . .'"  2012 WL 4458342, at *4.  Thus, the Tenth Circuit did not explain how the evidence of training, if any, applied to the analysis of, or gave context for, how the amount of force used by the officers was reasonable.

While it is unlikely that the Tenth Circuit is reconsidering its categorical bar of plaintiffs' use of SOP evidence to prove a Fourth Amendment violation in excessive force cases, the Tenth Circuit appears to have drawn a distinction between SOPs and training.  It appears that, since holding in Tanberg v. Sholtis that evidence of SOPs is irrelevant to the analysis whether a use of force violates the Fourth Amendment, see 401 F.3d at 1163, and since reading that holding to "foreclose" a plaintiff from introducing evidence of police department training materials as evidence of a police officers' reasonableness,  Gianetti v. City of Stillwater, 216 F. App'x at 766, the Tenth Circuit has retreated from equating SOPs and training.  Because Gianetti v. City of Stillwater and Hurley v. City of Owasso are unpublished opinions, though they may be persuasive for their reasoning -- if possible in light of the conflicting holdings -- neither are binding as precedent.  See 10th Cir. R. App. P. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their precedential value."); United States v. Lyons, 510 F.3d at 1233 n. 2 ("Unpublished opinions are not binding precedent. . . We mention [an unpublished opinion] as we would an opinion from another circuit, persuasive because of its reasoned analysis.").   Weigel v. Broad is a published opinion, however, and binding upon the Court at least to the extent of the holding.

Although the language in Weigel v. Broad may be construed to allow training to be admissible as evidence whether a defendant police officer acted reasonably under the circumstances,

the Court has explained other possible readings of the decision.  As Judge O'Brien points out in his dissenting opinion, the training manual in Weigel v. Broad was relevant evidence -- though he does not find it persuasive -- that the defendant officers' actions violated clearly established law, because the portions of the training manual instructing the officers how to deal with the situation they faced, possible asphyxiation, were recently written to reflect the Tenth Circuit's opinion in Cruz v. City of Laramie.  Judge O'Brien recognized that Tenth Circuit law suggests, if not requires, that training is irrelevant to the Fourth Amendment analysis in footnote 19 of his dissenting opinion: "I disagree that training has any relevancy in the qualified immunity analysis."  Weigel v. Broad, 544 F.3d at 1167 n.19.  He recognized that, while training reflects the law, it does not establish it; police enforcement agencies may impose stricter requirements in training than what the law requires.  See 544 F.3d at 1173 ("The training may well reflect value judgments about matters beyond what established law requires. But the law dictates officer training, not the other way around.").  It is possible, however, to view training, and the reasons training was imposed or amended, as probative whether the law was clearly established at the time of the allegedly unlawful conduct.  Because this step of the qualified immunity analysis is a determination that courts usually make at the summary judgment stage, except "in exceptional circumstances," limiting the use of evidence of training to this purpose all but eliminates the possible prejudice against the defendant police officer, or the danger that the evidence may confuse the jury, about which the Tenth Circuit has voiced concerns if SOPs are admitted.  Gonzales v. Duran, 590 F.3d 855, 859 (10th Cir. 2009)("Qualified immunity is 'almost always' a question of law . . . . A trial court may submit a question of qualified immunity to the jury only in exceptional circumstances . . . .")(citing Keylon v. City of Albuquerque, 535 F.3d 1210, 1217 (10th Cir. 2008)).  Under this limited use of training evidence, the jury is never exposed to defendant's training in the context of the circumstances underlying the alleged unlawful conduct,

and thus cannot use that training to analyze whether the defendant acted in conformity with the

defendant's training or training materials provided.[5]  Using evidence of training or training materials

---

[5]There is another possible rationale for Judge Seymour's admission of the evidence of training in Weigel v. Broad. The Court, in United States v. Gould, No. CR 03-2174 JB (D.N.M. 2007)(Browning, J.), distinguished between a defendant's conformity to SOPs as evidence of the objective reasonableness of a defendant's conduct and evidence of what he learned about the SOPs in his training as evidence of his subjective willfulness in shooting an inmate with non-lethal projectiles.  Because the Court recognized that the issue of willfulness encompassed questions about the defendant's knowledge of the extent of harm, which the defendant would have learned in training, but of which he disclaimed knowledge at trial, the Court allowed in evidence of police practices and training, but provided a limiting instruction to the jury:

> [L]adies and gentlemen, let me remind you, and I will remind you throughout this case, maybe at other times, the issue in the case is not whether John Gould followed or violated generally accepted police practices or training but whether he violated federal law. You may not consider whether Mr. Gould may or may not have violated anyone's Fourth Amendment rights because he may not have followed his training. You may also not consider testimony about the training of the defendants for the truth of the matter asserted. You cannot accept what was said as actually true. You can only use the testimony about the training for determining the defendant's state of mind or [his] knowledge.

> Even if you find or determine that Mr. Gould did or did not follow generally accepted police practices and procedures or training or standards or whatever the words used, the issue that you must determine in this case is whether the defendants' conduct was objectively reasonable under the circumstances, not whether [he] acted consistent or inconsistent in any way with his training.

Transcript of Trial, Direct Examination of Joseph Garcia at 139-40, United States v. Gould, No. CR 03-2274 JB (D.N.M. 2007).  Thus, as the Court let in the defendant's training and police practices in United States v. Gould for the limited purpose of circumstantial evidence of his state of mind and knowledge, so here, Judge Seymour could have intended to let in evidence of the defendant's police academy training manual for the limited purpose of notice and thus also as circumstantial evidence of the defendant's state of mind.  The language in Weigel v. Broad's holding as to the officers' reasonableness, however, does not seem to support such a limited reading.  See 544 F.3d at 1152 ("[T]here is evidence a reasonable officer would have known that the pressure . . . created a significant risk of asphyxiation and death. . . . WLEA training materials made clear that the pressure applied to Mr. Weigel's upper torso would suffice to cause his suffocation."); id at 1155 ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training.").  The Court, therefore, reads Weigel v. Broad as establishing that evidence of training is relevant and admissible evidence of what is reasonable under the Fourth Amendment.

as a context for the officers' conduct under the circumstances -- in effect comparing the officers' conduct to police departments' value judgments about the law's requirements -- may, however, be prejudicial to defendant officers, and also confuse the jury as to the requirements of the law, where those judgments go beyond what the law requires.

The conflicting rulings in <u>Gianetti v. City of Stillwater</u> and <u>Hurley v. City of Owasso</u> must be largely put aside. The issue whether the law was clearly established was important to the Tenth Circuit's discussion of the importance of the training in Judge Seymour's opinion in <u>Weigel v. Broad</u>, but only Judge O'Brien made a distinction between reasonableness and clearly established, and he was in dissent. The issue whether the law was clearly established was not before the Court in <u>Tanberg v. Sholtis</u>. It thus appears that, under the majority opinion in <u>Weigel v. Broad</u>, Tenth Circuit law allows training to be admitted as evidence of a police officer's reasonableness in the officer's use of force in conducting an arrest.

The Court cannot find a logically sound reason to distinguish between SOPs and training. Both, the Court believes, are designed and used as guidelines to instruct officers what conduct is reasonable under given circumstances. Logically, if training "duplicates the reasonableness standard that governs claims of excessive force under . . . the Fourth Amendment," <u>Tanberg v. Sholtis</u>, 401 F.3d at 1163, it should be excluded, as the Tenth Circuit held in <u>Gianetti vs. City of Stillwater</u>. On the other hand, as can be seen from the Court's opinion in <u>Taylor v. Hudson</u>, the Court was, when it first came on the bench, sympathetic to the Montoyas' positions and Judge Seymour's conclusion. Coming from a civil background, the Court often saw that, when a plaintiff sued a corporation, a plaintiff would seek the defendant corporation's standard procedures, to show that the corporation acted unreasonably by not even complying with its own rules. As the Tenth Circuit has stated:

Although a company's internal policies do not alter the applicable standard of care,

they are admissible to show negligence, even if the policies demand a higher
standard of care than the applicable law.  We have permitted admission of such
policies when the jury is instructed that they are not admitted as legal standards of
duty, but as evidence of the measure of caution that ought to be exercised in the
situations to which they apply.

Therrien v. Target Corp., 617 F.3d 1242, 1256 (10th Cir. 2010)(internal quotations and citations

omitted).  See LaVine v. Clear Creek Skiing Corp., 557 F.2d 730, 733 (10th Cir. 1977)(recognizing

"the principle that a regulation setting forth a standard is considered to be proper evidence. . . . [And]

that evidence of customary conduct is normally relevant and admissible.")(citing Prosser, Law of

Torts 166 (1971); Restatement (Second) of Torts § 295A, cmt. b ("Any such custom of the

community in general, or of other persons under like circumstances, is always a factor to be taken

into account in determining whether the actor has been negligent.")).  Nevertheless, the Tenth

Circuit law has taken a repeatedly narrow view of the relevance of SOP evidence in the Fourth-

Amendment arena, and the Court has had to conform its opinions and rulings accordingly.  The

Court concludes that the Tenth Circuit has given guidance regarding the admissibility of SOPs for

purposes of the Fourth Amendment reasonableness inquiry in excessive force cases and, while less

clear, binding precedent regarding training materials.  The Court can thus no longer adhere to its

prior rulings excluding both SOPs and training. While the Court did not grant the Montoyas'

requests in this case, the Court may be required to allow training in future excessive force cases.

See Kerns v. Bd. of Comm'rs of Bernalillo Cnty., No. CIV 07-0771 JB/ACT, 2012 WL 3656469,

*35 (D.N.M. Aug. 22, 2012)(Browning, J.)("The Court must faithfully follow the Tenth Circuit's

decision and judgment."). [6]

---

[6]The Court's pre-trial oral ruling about training, which the Court has decided was error, did
not create any error or prejudice at trial, because the Defendants included evidence of training in
their evidence and the Montoyas did not object; thus, the Defendants waived the protections of the
in limine order they secured, and opened the door to evidence of Shelden's and Lovato's training

-27-

II.   **THE COURT WILL ALLOW THE MONTOYAS TO USE EVIDENCE OF SHELDEN'S AND LOVATO'S ALLEGED VIOLATIONS OF THE SOPS AND OF THEIR TRAINING TO THE EXTENT NECESSARY TO REBUT SHELDEN'S AND LOVATO'S TESTIMONY ON DIRECT EXAMINATION.**

If Shelden and Lovato offer the Reactive Control Model into evidence, and testify that their actions complied with this Model and their training in regards to the model, they will open the door to the Montoyas' rebutting such testimony, and the Court will allow the Montoyas to cross-examine Shelden and Lovato on the Model and impeach any testimony they believe was untruthful.  The doctrine of specific contradiction provides that, where a party makes a misrepresentation or untruthful statement on the stand, a party can impeach a witness's testimony extrinsically under rule 608(b) through evidence that may otherwise be irrelevant or inadmissible.  See Montoya v. Shelden, 2012 WL 4950707, at *12 ("This doctrine, known as specific contradiction, allows such impeachment even if the evidence elicited ordinarily might be collateral or otherwise inadmissible.").  Should Shelden and Lovato offer the Reactive Control Model into evidence, the Montoyas are permitted to cross-examine Shelden and Lovato about the Model, and impeach their testimony regarding the Model, even though the Model is otherwise irrelevant and inadmissible.

The Montoyas' impeachment using the SOPs, however, is still subject to rule 403's balancing test.  As the Tenth Circuit has noted: "Given the minimal probative value of an SOP . . . and the likelihood that the jury could confuse legal and administrative standards, we cannot find that the trial court abused its discretion in excluding the evidence . . . ."  Tanberg v. Sholtis, 401 F.3d at 1163. The SOPs offered to impeach Shelden or Lovato are offered not to show the standard of care, or that Shelden or Lovato breached that standard of care by not conforming their conduct to the SOPs -- thus offered to show they acted unreasonably -- but they are offered rather to show that Shelden's

_____

to come into the case.

and Lovato's testimony that they acted pursuant to the SOPs was untruthful.  To cross-examine Shelden and Lovato before the jury with the SOPs, the evidence to which the jury has already been exposed to on Shelden's and Lovato's direct examination, for the proper, limited purpose of showing that their testimony on direct was untruthful, tends to make much more probable that they did, or did not, abide by the SOPs as they testified.  Similarly, should Shelden and Lovato, on either direct examination or cross examination, testify that they complied with the SOPs or their training otherwise than with regard to the Reactive Control Model chart, the Court will, at that time, allow the Montoyas to impeach such testimony using the SOPs, or Shelden's or Lovato's training, as necessary.  The probative value of the SOPs, and evidence of Shelden's and Lovato's training, is increased if there is a lie, and outweighs the danger of unfair prejudice that results from the jury being exposed to the SOPs.  The Court can reduce the danger of unfair prejudice of the Montoyas' introduction of the SOPs by giving a limiting instruction to the jury at Shelden's and Lovato's request, to direct the jury that the SOPs are only to be used to impeach their testimony.  The Court is not ignorant, however, to the danger that the jury will confuse the issues, or the danger of unfair prejudice to Shelden and Lovato, from the possibility that the jury may nevertheless use the SOPs for an improper purpose.  The Court will therefore be mindful to limit the evidence of SOPs as much as possible to be fair to both parties.

Allowing the Montoyas to present evidence of the SOPs, which are otherwise inadmissible and irrelevant, only to the extent necessary to rebut Shelden's and Lovato's use of the SOPs, finds support in rule 611(b) of the Federal Rules of Evidence and the policy behind this rule.  Rule 611(b) limits the scope of cross-examination to the scope of direct examination in most circumstances, providing: "Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility."  Fed.R.Evid. 611(b).  Professors Charles Wright and

Victor Gold have discussed the policy behind this subject-matter limitation on cross-examination:

> The only plausible policy justification for the subject-matter limitation is that it permits the direct examiner to determine the topics on which each of his witnesses will testify, thereby presenting evidence in an orderly and comprehensible manner. In other words, by limiting cross-examination to the subject matter of the direct, subdivision (b) precludes the cross-examiner from creating diversions and digressions into different topics that may confuse or otherwise unfairly prejudice the jury.

28 C. Wright & V. Gold, Fed. Practice and Procedure § 6165, at 434.  The logical inverse of limiting cross-examination to the scope of direct for the purpose of precluding the cross-examiner from inquiry into topics that may confuse or otherwise prejudice the jury is that, when the direct-examiner broadens the scope to specifically inquire into topics that may be otherwise excluded, the scope of cross-examination is also broadened.  Because the scope of direct-examination is what also allows for broadening the scope of cross-examination, it only broadens the scope an equal extent.  Thus, the Court will allow the Montoyas to offer evidence of APD SOPs only to the extent necessary to rebut Shelden's and Lovato's affirmative offer of such evidence.  The Court will therefore allow the Montoyas to offer evidence of Shelden's and Lovato's violations of the SOPs only to the extent necessary to rebut Shelden's and Lovato's affirmative offer of their compliance with the SOPs or their training.

**IT IS ORDERED** that the requests in the Defendants' Motion in Limine and Memorandum in Support to Exclude any Evidence Regarding Alleged Violation of Police Standard Operating Procedures, filed September 4, 2012 (Doc. 58), are granted in part and denied in part.  The Court will exclude evidence  of Defendants Gerald Shelden's and Angelo Lovato's alleged violations of police standard operating procedures, and of their police training.  To the extent Shelden and Lovato offer into evidence their compliance with the SOPs and their training at trial, the Court will allow the Montoyas to introduce evidence of Shelden's and Lovato's alleged violation of the SOPs and

their training on cross-examination to the extent necessary to rebut Shelden's and Lovato's testimony.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Louren Oliveros
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

-- and --

Timothy M. Padilla
Timothy M. Padilla and Associates, P.C.
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*

David Tourek
  City Attorney
Stephanie M. Griffin
Paul M. Cash
  Assistant City Attorneys
City of Albuquerque
Albuquerque, New Mexico

   *Attorneys for the Defendants*